946 A.2d 500

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Barbara Osborn KREAMER.**

**Misc. Docket AG No. 18, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 17, 2008.

284

Gail D. Kessler, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n), for petitioner.

Benjamin Lipsitz, Baltimore, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, WILNER, ALAN M. (Retired, Specially Assigned) CATHELL, DALE R. (Retired, Specially Assigned), JJ.

GREENE, J.

The Attorney Grievance Commission of Maryland, acting through Bar Counsel and pursuant to Maryland Rule 16–

751(a),[1] filed a Petition For Disciplinary or Remedial Action against Respondent Barbara Osborn Kreamer on June 22, 2006.[2] The Petition alleged that Respondent violated multiple provisions of the Maryland Rules of Professional Conduct in her representation of six *former clients*: Patricia Goodwin, Courtney Anderson, David Ferrara, Gregory Dudok, Michael Boone, and Sarah Caldarelli. Bar Counsel alleged that Respondent violated most of the same rules in the six individual cases: Rule 1.1 (Competence),[3] Rule 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer),[4] Rule 1.3 (Diligence),[5] Rule 1.4 (Communication),[6] Rule 1.5

---

1. Maryland Rule 16–751(a) provides in pertinent part:
   (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of [the Attorney Grievance] Commission. Upon approval of the [the Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Bar Counsel filed an amended petition with this Court on June 8, 2007.

3. MRPC 1.1 provides:
   A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

4. MRPC 1.2 provides in relevant part:
   (a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

5. MRPC 1.3 provides:
   A lawyer shall act with reasonable diligence and promptness in representing a client.

6. MRPC 1.4 provides:
   a) A lawyer shall:
   (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent ... is required by these Rules;

## (Fees),[7] Rule 1.15 (Declining or Terminating Representation),[8]

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information;

(4) consult with the client about any relevant limitations on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

7. MRPC 1.5(a) provides:

A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

8. MRPC 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b)Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

Rule 8.1 (Bar Admission and Disciplinary Matters),[9] Rule 3.3 (Candor Toward the Tribunal),[10] and Rule 8.4 (Misconduct)[11].

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

9.  MRPC 8.1 provides:
An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement or material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

10.  MRPC 3.3 provides, in pertinent part:
(a) A lawyer shall no t knowingly:
(1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

11.  MRPC 8.4 provides:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice;
(e) state or imply an ability to influence improperly a government agency or official; or,
(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

Pursuant to Maryland Rules 16–752(a)[12] and 16–757(c),[13] we referred the matter to the Honorable Emory A. Plitt, Jr., of the Circuit Court for Harford County to conduct an evidentiary hearing and to submit to this Court proposed findings of fact and conclusions of law. After hearing evidence over a 6–day period, Judge Plitt filed a 31–page opinion in which he made detailed findings of fact and conclusions of law, culminating in a determination that Respondent violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 1.16, 8.4(a), (c), and (d). Respondent filed written exceptions to several of the hearing judge's findings of fact and conclusions of law.[14] Bar Counsel filed no exceptions.

## STANDARD OF REVIEW

"In proceedings involving attorney discipline, this Court has original and complete jurisdiction and conducts an independent review of the record." *Attorney Grievance Comm'n v. Cherry–Mahoi*, 388 Md. 124, 152, 879 A.2d 58, 76

---

**12.** Maryland Rule 16–752(a) states:
    (a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

**13.** Maryland Rule 16–757(c) states in pertinent part:
    (c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law.

**14.** Pursuant to Md. Rule 16–758, either party may file post-hearing written exceptions to the findings and conclusions of the hearing judge. If no exceptions are filed by either party, we "treat the findings of fact as established for the purposes of determining appropriate sanctions, if any." Maryland Rule 16–759(b)(2)(A). If exceptions are filed, however, Maryland Rule 16–759(b)(2)(B) provides that this Court "shall determine whether the findings of fact have been proven by [clear and convincing evidence,] the requisite standard of proof set out in Rule 16–757(b)." In addition, "we may confine [our] review to the findings of fact challenged by the exceptions." *Id.*

(2005). "In our review of the record, the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous." *Attorney Grievance Comm'n v. Harris*, 403 Md. 142, 155–56, 939 A.2d 732, 740 (2008). *See also* Maryland Rule 16–759(b)(2).[15] As we noted in *Attorney Grievance Comm'n v. Mahone*, 398 Md. 257, 266, 920 A.2d 458, 463 (2007):

> As to the scope of our review, we take into consideration whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). This Rule provides that Bar Counsel has the burden of proving the averments of the petition by clear and convincing evidence, and the attorney who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter of mitigation or extenuation by a preponderance of the evidence. Weighing the credibility of witnesses and resolving any conflict in the evidence are tasks proper for the fact finder.

(Internal citations and quotations omitted.) "As to the hearing judge's conclusions of law, such as whether the provisions of the MRPC were violated, our consideration is essentially *de novo.*" *Harris*, 403 Md. at 156, 939 A.2d at 740. *See also* Maryland Rule 16–759(b)(1).

---

**15.** Maryland Rule 16–759(b)(2) provides:

(b) **Review by Court of Appeals.**

\* \* \*

(2) Findings of Fact. (A) If no exceptions are filed. If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any.

(B) If exceptions are filed. If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses

## I.

## EXCEPTION TO THE BACKGROUND SECTION
## OF HEARING JUDGE'S OPINION

Respondent first excepts to the Background section of the hearing judge's written opinion. In this section, the hearing judge writes:

This is the fourth "formal" disciplinary action brought against Respondent by the Attorney Grievance Commission. On February 2, 1999, she was indefinitely suspended. *See Attorney Grievance Commission v. Kreamer*, 353 Md. 85, 724 A.2d 666 (1999). She was reinstated by the Court of Appeals on June 10, 1999. On November 19, 2002, she was issued a public reprimand. By Opinion of June 21, 2005, she was indefinitely suspended from the practice of law with the right to apply for reinstatement within six months. *See Attorney Grievance Commission v. Kreamer*, 387 Md. 503, 876 A.2d 79 (2005). She has never been reinstated and has remained indefinitely suspended since the Petition in this case was filed on June 22, 2006.

Respondent was admitted to practice before the Court of Appeals on December 18, 1991. Respondent resides in Harford County at 701 Beards Hill Road, Aberdeen, Maryland 21001, and conducted her practice of law from her home. The Petition for Disciplinary Action, *sub judice* involves complaints made to the Attorney Grievance Commission by six former clients of Respondent: Patricia Goodwin; Courtney Anderson; David Ferrara; Gregory Dudok; Michael Boone; and Sarah Caldarelli. From the evidence presented during the course of trial, the events involved in these six complaints all occurred prior to Respondent's indefinite suspension.

Respondent is charged with violating multiple provisions of the *Maryland Rules of Professional Conduct* in these six complaints from former clients. For the most part, she is charged with violating most of the same rules in the six individual cases. For ease of reference, I first set out in full the rules which she is alleged to have violated in these

complaints. I thereafter treat each complaint individually and relate it back to the particular rules at issue.

Respondent complains that this section "does not seem to be directed to any factual issues relevant to determining violations vel non by Respondent of any MRPC rules," but rather focuses on her disciplinary history. Specifically, Respondent "suggests that the content of this section might well be taken by a disinterested reader as placing Respondent in a decidedly unfavorable light, particularly when asserted so early in the hearing judge's submission and prior to any consideration therein of the merits of the respective positions of the parties." Respondent asks this Court to not consider the Background section when it "determines whether or not any act or omission on Respondent's part alleged in the [hearing judge's opinion] violated any MRPC rule charged therein."

We overrule Respondent's first exception. It is clear from the entirety of the hearing judge's opinion that the judge's decision to include a preliminary section describing Respondent's previous disciplinary encounters with this Court did not influence his findings of fact or conclusions of law with regard to the six complaints against Respondent. The analysis utilized by the hearing judge in finding that Respondent violated the MRPC does not include any mention of Respondent's disciplinary history. Therefore, there is nothing in the opinion to suggest that the inclusion of a section describing Respondent's disciplinary history in any way influenced the outcome of the circuit court proceeding.

Moreover, in *Attorney Grievance Comm'n v. Harris*, 403 Md. 142, 157, 939 A.2d 732, 741 (2008), we previously overruled and addressed a similar exception. In *Harris*, the attorney excepted to the hearing judge's finding that the attorney had been suspended from the practice of law in 2002 and had not been reinstated as of the date of the hearing judge's opinion. *Id.* The attorney argued that the finding was "immaterial and irrelevant to any alleged violation of the MRPC." *Id.* We overruled the attorney's exception, stating:

The issue of this finding's relevancy is dictated by Rule 16–757(c), which states that the hearing judge "shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law." It is clear that findings regarding Respondent's status as an attorney are relevant and material to any "remedial action." Respondent admitted, when he testified, that he has been suspended from the practice of law since 2002. We, therefore, conclude that the hearing judge's factual findings are supported by clear and convincing evidence and overrule this exception.

*Id.* In the case *sub judice,* Respondent's disciplinary history is a matter of public record, *see* Maryland Rule 16–723(c), and is relevant to any "remedial action" that might be undertaken by this Court. *See Attorney Grievance Comm'n v. Kreamer,* 387 Md. 503, 876 A.2d 79 (2005). Thus, Respondent's exception is overruled.

## II.

## THE COMPLAINT OF GREGORY M. DUDOK

The hearing judge made the following findings of fact and conclusions of law concerning the complaint of Gregory M. Dudok:

With regard to the complaint of Gregory Dudok, Ms. Kreamer is charged with violating **Rules 1.1, 1.2, 1.3, 1.4, 1.16, 8.1,** and **8.4.**

### *FINDINGS OF FACT*

██ Gregory Dudok was the Vice President of a corporation known as The Broken Spoke Family Association, Inc. On or about March 25, 2003, Mr. Dudok retained Ms. Kreamer to dissolve the corporation. He paid her a retainer fee of $ 300.00. Also on that date, Mr. Dudok signed a retainer/engagement agreement. The agreement provided that Ms. Kreamer would perform all necessary legal services to dissolve the corporation. Ms. Kreamer also agreed to keep Mr. Dudok appraised of all developments in the case. The agreement provided that $100.00 of the $300.00

retainer was to be considered as a non-refundable engagement fee.[16] The fee arrangement was on an hourly basis at the rate of $150.00 plus expenses. The agreement also provided that Ms. Kreamer would render bills on a monthly or quarterly basis "as applicable." Ms. Kreamer also agreed that she would "make every effort to expedite client's case promptly and efficiently according to the highest legal and ethical standards." The $300.00 fee was deposited in her escrow account on March 25, 2003. She withdrew the $100.00 "engagement fee" from her escrow account on March 25, 2003. On the same date that he engaged Ms. Kreamer to perform the dissolution, he turned over to her the corporate books and papers for her use.

Simply stated, after March 25, 2003, Ms. Kreamer did absolutely nothing to perform the services requested by Mr. Dudok. After waiting over one year for Ms. Kreamer to follow through, Mr. Dudok attempted to contact her. She received Mr. Dudok's messages. Ms. Kreamer, however, never contacted Mr. Dudok in response to the messages that he had left until Saturday night, September 4, 2004 at approximately 9:00 p.m. Ultimately Mr. Dudok contacted the State Department of Assessment and Taxation about trying to dissolve the corporation. Some unidentified but practical employee of the department suggested to Mr. Dudok that he might just want to let the corporate charter lapse rather than go through the trouble of dissolving it which is exactly what Mr. Dudok did.

After receiving no response to his attempts to contact Ms. Kreamer, Mr. Dudok filed a complaint with the Attorney

---

16. An engagement fee is considered the same as a general retainer or an "availability fee." *See In re Gray's Run Technologies, Inc.*, 217 B.R. 48, 53 (Bankr.M.D.Pa.1997); *In re Printing Dimensions, Inc.*, 153 B.R. 715, 719 (Bankr.D.Md.1993). In *In re Gray's Run Technologies, Inc.*, the court described this type of named retainer "as a sum of money paid by a client to secure an attorney's availability over a given period of time." 217 B.R. at 53 (quotation and citation omitted). The court continued: This type of retainer binds a lawyer to represent a particular client while foreclosing that attorney from appearing on behalf of an adverse party. [This] fee is generally considered "earned upon receipt" or "non-refundable." *Id.* (citations omitted).

Grievance Commission. It was only after the complaint was filed that Ms. Kreamer contacted Mr. Dudok by letter. She acknowledged in the letter that she had received the telephone messages in June. Ms. Kreamer also admitted that she did not respond to those inquires.

Ms. Kreamer attempted to defend her actions in this matter by claiming that she needed Articles or a Resolution of Dissolution showing that the Board of the Association had taken formal action approving a dissolution. However, she never told Mr. Dudok that she needed any such documentation. In fact, the first time she ever mentioned this to Mr. Dudok was in her letter of September 4, 2004. Despite not having done a single thing to perform the services requested, Ms. Kreamer offered to complete the work in her letter of September 4, 2004. She enclosed with the letter of September 4, 2004, a refund of the $300.00 that Mr. Dudok had paid.

When Mr. Dudok attempted to first track down Ms. Kreamer in June of 2004, he specifically left messages for her that he needed back all of the corporate documents which he had originally given her. She, however, did not respond to that request until September 12, 2004. Keeping in mind that Ms. Kreamer had all the corporate books and papers since March 25, 2003, in June of 2004, Mr. Dudok realized that he needed all of those documents back in order to file tax returns. Up to that point, Mr. Dudok had assumed that Ms. Kreamer had followed through. He found that she had not followed through when he contacted the State Department of Assessments and Taxation. Ms. Kreamer could not offer any explanation as to why she never did anything to follow through and why she did not return Mr. Dudok's telephone calls nor keep him advised of the status of the matter.

## CONCLUSIONS OF LAW

I find by clear and convincing evidence that Ms. Kreamer violated the rules of professional conduct alleged by Petitioner in conjunction with her engagement by Mr. Dudok. Ms. Kreamer incompetently represented Mr. Dudok in vio-

lation of Rule 1.1 by not exhibiting the thoroughness and preparation reasonably necessary for the engagement by her failure to prepare and file the necessary documents to dissolve the association. Further, Ms. Kreamer never orally or in writing told Mr. Dudok that she needed a Corporate Resolution or Minutes to reflect agreement on dissolving the corporation.

Her failure to do anything on behalf of Mr. Dudok for over one year violated Rules 1.2 and 1.3 by her failure to abide by her client's request that a dissolution be filed on behalf of the corporation and by failing to act in a reasonable time to conclude the representation. In point of fact, as noted in my Findings of Fact, she did absolutely nothing for over fifteen months.

She also violated Rule 1.4 by failing to communicate with Mr. Dudok, as noted, for over one year, and violated Rule 1.16(d) by failing to advise Mr. Dudok that she had done nothing and had in essence abandoned her representation. It should be obvious that if Mr. Dudok had not contacted her in June of 2004, she would have continued to do nothing to follow through on her client's direction concerning the dissolution.

She also violated Rule 8.4(c) by taking the $100.00 non-refundable "engagement fee" upon representation and the $200.00 retainer and then never contacting Mr. Dudok at all or keeping him up to date on her progress. Perhaps most telling was her inability to answer the question posed to her at trial as to when, if ever, she was going to do anything to follow through. She could not answer. She took the money with obviously no intent to pursue the matter. Ms. Kreamer's total lack of any follow through for well over one year, her failure to respond to Mr. Dudok's inquires, and her failure to return the corporate books until over three months after she was asked were certainly prejudicial to the administration of justice in violation of Rule 8.4(d).

(Internal record citations.)

Respondent submits four exceptions to the hearing judge's factual findings regarding her representation of Mr. Dudock.

Respondent first complains that the hearing judge erred in finding that Mr. Dudock "turned over to [Respondent] the corporate books and papers" for her use. Respondent contends that this finding "lacks the requisite evidentiary support" because "the record [ ] seems to indicate that Mr. Dudock gave Respondent a single 'corporate' book." In addition, Respondent contends that Mr. Dudock did not actually turn over all necessary documents for the dissolution of the corporation; specifically, he did not turn over formalized minutes recording the approval of the dissolution of the corporation. We find this exception is without merit. While the hearing judge's use of the phrase "corporate books and papers" may not be the most precise phraseology, it nonetheless is supported by the record. Mr. Dudock testified that on March 25, 2003, he turned over *all documents of the corporation that were in existence at that time.* The omission of a formalized record of the vote of the corporation's board of directors from the notebook does not render the hearing judge's finding unsupported by the evidence. While these papers may not have been voluminous or numerous, the intent of the hearing judge's statement is clear, Mr. Dudock relinquished to Respondent all corporate documents in his possession at the time he signed the retainer agreement.

Second, Respondent excepts to the hearing judge's finding that "after March 25, 2003, [Respondent] did absolutely nothing to perform the services requested by Mr. Dudock." [17] Respondent contends that this finding is in error because Respondent testified that after she met with Mr. Dudock on March 25, 2003, she, at a minimum, researched Maryland statutes regarding dissolution of corporations. Respondent's exception misses the point. The hearing judge found that Respondent did little to no work on the matter which Mr. Dudock hired Respondent to complete; that is, to bring about

---

17. In addition, Respondent excepts to two other, similar factual findings: (1) "Despite not having done a single thing to perform the services requested . . . ;" and, (2) "Ms. Kreamer could not offer any explanation as to why she never did anything to follow through. . . ." We shall combine these exceptions and address them together.

the formal dissolution of The Broken Spoke Family Association, Inc. According to Mr. Dudock's testimony, he turned over corporate documents to Respondent on March 25, 2003. Mr. Dudock then testified that at no time afterward did Respondent communicate to him her need for a formalized record of the vote of the Board of Directors approving the dissolution of the corporation. While Respondent may have researched Maryland statutory law on the dissolution of a corporation, it is clear from the record that Respondent, in the year that she had the corporate documents, did not undertake any other steps to effectuate the corporation's dissolution, including the most basic step of requesting from Mr. Dudock a formalized record of the vote of the Board of Directors approving the dissolution of the corporation. The exception is overruled.

## III.

### *THE COMPLAINT OF COURTNEY ANDERSON*

The hearing judge made the following findings of fact and conclusions of law concerning the complaint of Courtney Anderson:

With regard to the complaint of Courtney Anderson, Ms. Kreamer is charged with violating Rules 1.3, 1.4, 1.5, and 8.4.

### *FINDINGS OF FACT*

On April 24, 2003, Courtney Anderson hired Ms. Kreamer for representation in her divorce. Ms. Kreamer and Ms. Anderson signed a retainer/engagement agreement in which Ms. Anderson agreed to pay Ms. Kreamer a retainer of $1,200.00, $600.00 of which was considered to be a non-refundable engagement fee. On that same date, Ms. Kreamer deposited the $1,200.00 into her escrow account. The $1,200.00 was paid on Ms. Anderson's behalf by her mother, Jackie Turner. Ms. Kreamer then removed the $600.00 of the $1,200.00 retainer from her escrow account as her "engagement fee". Prior to retaining Ms. Kreamer, Ms. Anderson and her husband had already separated and

divided marital assets. Ms. Anderson was already receiving child support and she told Ms. Kreamer at the outset of the engagement that there were no issues concerning alimony, retirement, marital property or child custody as those matters had previously been resolved between Ms. Anderson and her husband. Ms. Anderson further told Ms. Kreamer that Mr. Anderson was agreeable to everything and requested that Ms. Kreamer prepare a Property/Separation Agreement to memorialize the agreement.

During her first meeting with Ms. Kreamer, Ms. Anderson was told by Ms. Kreamer that she would "get right on it." However, after hiring Ms. Kreamer in April, Ms. Anderson had no contact from Ms. Kreamer for five months thereafter. Ms. Anderson attempted to contact Ms. Kreamer at least once a month for those five months following her retention but never got any response. She became so concerned about the lack of a response that she increased her telephone calls to Ms. Kreamer's office to weekly. The first communication of any kind that Ms. Anderson received from Ms. Kreamer was a copy of a letter dated September 29, 2003 which Ms. Kreamer sent to Mr. Anderson advising him that she had been retained to represent Ms. Anderson.

Despite having been retained in April, Ms. Kreamer did nothing more to move the matter along until September 29, 2003, when she filed a Complaint for a Limited Divorce. It is absolutely clear that Ms. Kreamer did nothing to work on the Property/Separation Agreement until April of 2004, over one year later. A Master's hearing was scheduled in June of 2004. Ms. Kreamer, however, did not inform Ms. Anderson about the Master's hearing and the first that Ms. Anderson knew about it was when she received correspondence from Master Frederick Hatem. The only explanation Ms. Kreamer could offer was her claim that Ms. Anderson had changed addresses and it was hard to contact her. That explanation is unworthy of belief. At some point she paid Ms. Kreamer an additional $468.00 to cover what Ms.

Kreamer claimed to be the cost of the Master's Hearing. Ultimately, Ms. Anderson did in fact receive her divorce.

Ultimately when confronted by Ms. Anderson about the delay, Ms. Kreamer told her that she was "too busy." Ms. Kreamer never explained to Ms. Anderson why she was so busy or that she would pick up the pace. Ms. Anderson never agreed to delaying the matter, and because she had already resolved things with her husband, she did not think that the matter would be too complicated. In point of fact, Ms. Anderson lived down the street from Ms. Kreamer and it would appear to me that there was no good reason why Ms. Kreamer did not keep her informed or advise her that she had not gotten to her case.

Despite Ms. Kreamer having agreed to periodically bill Ms. Anderson, Ms. Anderson did not receive any bill or accounting until January 8, 2004, some eight and a half months after the representation began. Between the time of her retaining Ms. Kreamer and the billing of January 8, 2004, Ms. Anderson had no idea as to how the money she had paid Ms. Kreamer was being used or what, if any, efforts Ms. Kreamer had made towards moving her matter along. Evidently uncertain of the accuracy of the January 8, 2004 bill, four days later on January 12, 2004, Ms. Kreamer sent Ms. Anderson another invoice in a different amount. During the course of its investigation, the AGC obtained certain records from Ms. Kreamer concerning her representation of Ms. Anderson. The alleged contemporaneous billing records are virtually indecipherable. Ms. Kreamer also sent additional bills to Ms. Anderson on May 25, 2004 and July 19, 2004.

Ms. Anderson did not realize that Ms. Kreamer was charging her for things which should properly be considered as office overhead such as setting up a file, revising accounting records, etc. For example, Ms. Kreamer improperly billed Ms. Anderson 15 minutes time on September 23, 2003 for what she described as "file organization and time sheet." At the time that Ms. Kreamer billed Ms. Anderson for this, the only documents in her file were her initial notes and a

Financial Statement prepared on April 29, 2003. This task, according to Ms. Kreamer, involved merely putting Ms. Anderson's name on a file and putting documents in a file. She did nothing more than take a pre-printed form and place Ms. Anderson's name on it. Ms. Kreamer also charged Ms. Anderson other billing statements for "reimbursement of fees and review and revise accounting." This involved doing nothing other than filling out a deposit slip and updating her accounting records.

## CONCLUSION OF LAW

I find by clear and convincing evidence that by her conduct, Ms. Kreamer violated the rules as alleged. Her failure to prepare the Separation Agreement on behalf of Ms. Anderson and as Ms. Anderson requested within a reasonable time after being retained demonstrates a lack of diligence in violation of Rule 1.3. It must be kept in mind that at the time Ms. Kreamer was retained by Ms. Anderson, there were no outstanding issues concerning property, alimony, retirement or custody. Ms. Anderson was already receiving child support and Mr. Anderson was already agreeable to the terms they had worked out. Ms. Kreamer failed to take any action on Ms. Anderson's behalf until the end of September, 2003, five months after being retained.

Ms. Kreamer also violated Rule 1.4 by failing to maintain communications with Ms. Anderson and failing to return Ms. Anderson's telephone calls during the five month lapse between the time she was retained by Ms. Anderson and the first letter she sent to Mr. Anderson. Despite her obligation to do so, Ms. Kreamer failed to communicate with Ms. Anderson for eight and one-half months about how the money paid was being used and what Ms. Anderson owed. She did not send periodic billings to Ms. Anderson as was required by the retainer agreement.

Ms. Kreamer violated Rule 1.5 by unreasonably charging Ms. Anderson for such things as file organization, time sheet maintenance, reimbursement of fees and review and

revise accounting. These are matters of overhead in any law office. One is left to wonder what, if anything, she did to revise accounting because, as noted, her time sheets are totally unintelligible.

Her failure to diligently pursue Ms. Anderson's Separation Agreement and divorce, unreasonably charging her for administrative overhead as well as failing to maintain communications with Ms. Anderson, keeping her posted as to what was going on and not moving forward promptly is conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

(Internal record citations.)

Respondent excepts to the following statement made by the hearing judge: "Despite having been retained in April [of 2003], [Respondent] did nothing more to move the matter along until September 29, 2003. It is absolutely clear that [Respondent] did nothing to work on the Property/Settlement Agreement until April of 2004, over one year later." Respondent contends this finding is clearly erroneous, arguing:

The time interval referred to by the hearing judge in this finding was not inordinate, the complaint for divorce having been filed within four or five months of Respondent's entry into this matter. Although the complaint sought only limited divorce, so that it could have been filed earlier, in the interim, Ms. Anderson appeared to be comfortable with her situation in that she had been and still was talking with her husband about their martial situation and was receiving support money from him, including child support in an amount in excess of what she likely would have been awarded under the guidelines. She was unwilling to bring an action based upon her husband's adultery (he was then already involved with another woman, who was pregnant by him and awaiting the birth of the child . . .) which would have provided a ground for a much more immediate absolute divorce. She was also apparently herself involved with another man, although in her testimony she denied intimacy.

We overrule Respondent's exception as it does not address the underlying facts of the hearing judge's findings. Respondent's exception merely attempts to shift the responsibility for Respondent's failure to undertake steps to effectuate the divorce onto Ms. Anderson. The social construction of Ms. Anderson's and Mr. Anderson's relationship and their personal lives outside their marriage does not address or explain Respondent's failure to complete the task for which she was hired.

## IV.

### *THE COMPLAINT OF DAVID A. FERRARA*

As to the complaint of David A. Ferrara, the hearing judge made the following findings of fact and conclusions of law:

In this matter, Ms. Kreamer is charged with violating Rules 1.1, 1.2, 1.4, 1.5, and 8.4.

### *FINDINGS OF FACT*

On November 12, 2003, Mr. Ferrara retained Ms. Kreamer to represent him in a divorce and custody matter and paid a $1,500.00 retainer. $500.00 of the $1,500.00 retainer was considered to be a non-refundable engagement fee. The agreement between Mr. Ferrara and Ms. Kreamer provided that Ms. Kreamer would render bills on a periodic basis either monthly or quarterly, recapping the services rendered and itemizing any expenses. The agreement provided that Ms. Kreamer would represent Mr. Ferrara on an hourly basis at a rate of $160.00 per hour and further that she would "make every effort to expedite client's case promptly and efficiently according to the highest legal and ethical standards."

The calculation of child support is governed by *12–201– 12–204, Family Law Article, Maryland Code* and *Maryland Rule 9–206.* In particular, *Rule 9–206* sets forth the worksheets that are to be used in making child support calculations under two circumstances, primary physical custody and shared physical custody. The worksheets set forth

the exact manner in which child support is to be calculated. The statute requires the use of the guidelines. *Section 12–203, Family Law Article,* provides that the Court of Appeals mandates standardized worksheet forms to be used which, of course, is the purpose of Rule 9–206. On five different occasions during her representation of Mr. Ferrara, Ms. Kreamer calculated what she believed to be Mr. Ferrara's child support obligation. Each time, despite the information being the same, Ms. Kreamer told Mr. Ferrara that his child support obligation was a different figure. In contacts that Mr. Ferrara had with his wife, he learned that his wife's attorney had calculated the child support guidelines differently from the many attempts by Ms. Kreamer. Mr. Ferrara's wife was represented by H. Edward Andrews, Esquire. Concerned about the different figures he was being given, Mr. Ferrara went to the judiciary's website and accessed the required worksheet forms. Because of the improper calculation of the child support guidelines by Ms. Kreamer, Mr. Ferrara, after completing the forms, realized that there was at least a $200.00 discrepancy between Ms. Kreamer's calculations and those of his wife's attorney.

Ms. Kreamer admitted at trial that she improperly calculated Mr. Ferrara's child support obligations and further admitted that she used a form that she had created instead of the child support guidelines worksheet. It is important to note that although in her testimony she claimed to understand what the term "adjusted actual income" meant, she could not explain it. Despite instructions from me, not to look in her client file, she did so and tried to use Mr. Ferrara's wife's attorney's guidelines worksheet to explain the correct method of calculation. Ms. Kreamer ultimately admitted that she had made mistakes in the calculations. After discovering these errors, Mr. Ferrara became very insecure about Ms. Kreamer's method of calculation which was, of course, critical from his perspective.

Mr. Ferrara told Ms. Kreamer that because of his work and personal situation, it would be impossible for him to have his children with him every weekend and that he

agreed to his wife having primary physical custody of their children. Nevertheless, despite Mr. Ferrara's explicit instructions to Ms. Kreamer to the contrary, she insisted on calculating child support guidelines on a shared custody basis and pursued that with opposing counsel. Mr. Ferrara was very straightforward with Ms. Kreamer concerning custody and visitation, yet she did exactly the opposite of what Mr. Ferrara told her. Despite being aware of and having had brought to her attention the errors in the calculation of child support, Ms. Kreamer nevertheless charged Mr. Ferrara for the continuing erroneous calculations twice on November 25, 2003, once on December 1, 2003, once on December 3, 2003, once on December 24, 2003, and once on January 3, 2004.

A Pre–Trial Conference with the court was set for February 13, 2004. In discussions with Ms. Kreamer, Mr. Ferrara told her that he would be available on that date. However, Ms. Kreamer was not available. Ms. Kreamer then asked the court to reset the conference for February 20, 2004 but that was on a date that Mr. Ferrara was not available. He had told Ms. Kreamer prior thereto that he would not be available on February 20, 2004. Ms. Kreamer offered this Court no explanation as to why she rescheduled the Pre–Trial Conference on a date when her client was unavailable, despite knowing of his conflict in advance. Evidently, that Pre–Trial Conference did not take place.

Throughout her representation of Mr. Ferrara, he continually requested periodic invoices from Ms. Kreamer. That was in fact one of the conditions of the retainer agreement that she had with Mr. Ferrara. Even though the retainer agreement provided for billings to be done monthly or quarterly "as appropriate," he did not receive an invoice until February 11, 2004. With regard to the issue of the scheduling of the Pre–Trial Conference, Ms. Kreamer billed Mr. Ferrara for rescheduling this. Beginning on February 11, 2004, Mr. Ferrara received a number of invoices from Ms. Kreamer respectively dated March 3, 2004, June 30, 2004, and July 30, 2004. None of them agree. Mr. Ferrara

asked to see Ms. Kreamer's detailed billing records which are totally incomprehensible. One thing is clear from the detailed time records and the billing statements and that is, like the other complaints, Ms. Kreamer charged Mr. Ferrara for such administrative tasks as updating and revising her time sheets, file preparation, etc. Despite Mr. Ferrara's requests, Ms. Kreamer did not provide the requested detailed time sheet information until after Mr. Ferrara terminated her.

During her representation of Mr. Ferrara, Ms. Kreamer unreasonably continued to charge Mr. Ferrara for doing her own accounting. Ms. Kreamer in fact testified that she billed Mr. Ferrara for the time it took to document money she had received from him and to write a deposit slip. She charged Mr. Ferrara 1 hour and 30 minutes on March 3, 2004, for what she described as "accounting and file organization;" fifteen minutes on November 26, 2003 for "updating time sheet;" seven minutes on December 8, 2003 for "update time sheet;" five minutes on December 16, 2003 for "update time sheet;" and five minutes on January 5, 2004 for "time sheet update." In fact, it is questionable whether or not Ms. Kreamer had any idea at all about how much time she spent. Instead of keeping contemporaneous separate time sheets, she calculated the time spent on the matter by going to her "calendar books" and client files to figure out what she had done. It became apparent that some of the charges that she made for these administrative tasks were for her to figure out how much time she had spent.

By letter of March 3, 2004 Mr. Ferrara terminated Ms. Kreamer. His letter to Ms. Kreamer terminating her services is important in that it sets out in detail the events concerning the calculation of the child support guidelines and the issues concerning the scheduling of the Pre–Trial Conference and the bills. Of particular interest is the fact that (as verified by the bills) that on March 2, 2004, Mr. Ferrara paid Ms. Kreamer $500.00, and then the very next day she told him that he owed her an additional $810.00. She then changed that to say that he owed her an additional

$1,300.00. Mr. Ferrara continued to receive bills after he terminated Ms. Kreamer again none of which agreed. On June 30, 2004, Ms. Kreamer advised Mr. Ferrara that she had made some errors in her billing statements and deducted $570.00 from the balance he owed but then told him he still owed her $1,541.00. Ultimately, the fee dispute between Mr. Ferrara and Ms. Kreamer was resolved by arbitration and Mr. Ferrara paid an additional $72.00 over and above what he had previously paid.

One of the most troubling aspects of the Ferrara complaint is the fact that Mr. Ferrara, at the outset of the representation, asked Ms. Kreamer if she had ever had any prior disciplinary issues. It is absolutely clear to me that Ms. Kreamer misrepresented to Mr. Ferrara that she had never been in trouble with the bar. She absolutely knew when she was asked that question by Mr. Ferrara that she had been suspended on February 2, 1999 and issued a reprimand on November 19, 2002. Mr. Ferrara later found out the truth by consulting the Court of Appeals publicly available records through the internet.

## CONCLUSIONS OF LAW

There is no doubt by clear and convincing evidence that Ms. Kreamer has violated the rules of professional conduct as alleged by AGC. She incompetently represented Mr. Ferrara in violation of Rule 1.1 by not exhibiting the thoroughness and preparation reasonably necessary for the representation by her abject failure to understand and comprehend how to calculate child support. Although she claims that the majority of her practice was family law, she had no idea how or when to deduct child health care insurance costs when calculating child support. Furthermore, she did not understand the meaning of "adjusted actual income" in the calculation of child support. Had she understood what that term means and had she consulted the Family Law Article and the rules, it would not have been necessary to calculate the child support guidelines on five different occasions knowing that there was no dispute as to the figures to be "plugged in." Further, she did not com-

prehend the use of the required worksheets. Rather, she used some form that she had created which, as one can see, is at variance with the required worksheet.

Mr. Ferrara made it clear to Ms. Kreamer that because of his personal situation, he could not have the children every weekend yet, despite those instructions, she continued to propose that and charge Mr. Ferrara for proceeding in that fashion. She violated Rule 1.4 by failing to communicate with Mr. Ferrara throughout the representation as to how she was billing him, the accuracy of her billings, and how retainer funds were being used.

She unreasonably charged Mr. Ferrara for miscalculating the child support guidelines; for rescheduling the Pre–Trial Conference for which she knew he was not available; and for "updating time sheet" and for updating accounting and reimbursement all in violation of Rule 1.5. She unreasonably charged Mr. Ferrara for her mistakes as well as the cost for running her law office by updating her time sheets which was really trying to figure out how much time she had spent on his case, reviewing her accounting, and filling out deposit slips so that she could reimburse herself the cost of various court fees.

Lastly, Ms. Kreamer clearly violated Rule 8.4(c) by misrepresenting to Mr. Ferrara that she had never been in trouble with the bar. When asked that question by Mr. Ferrara she clearly replied no, knowing full well that there were at least two prior formal disciplinary actions by the Court of Appeals against her. It is also clear beyond any doubt that her conduct throughout the representation of Mr. Ferrara was conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

(Internal record citations omitted.)

Respondent first excepts to two of the hearing judge's findings: (1) "Ms. Kreamer ultimately admitted that she had made mistakes in the calculations. After discovering these errors, Mr. Ferrara became very insecure about Ms. Kreamer's method of calculation which was, of course, critical from his perspective."; and, (2)

Nevertheless, despite Mr. Ferrara's explicit instructions to Ms. Kreamer to the contrary, she insisted on calculating child support guidelines on a shared custody basis and pursued that with opposing counsel. Mr. Ferrara was very straightforward with Ms. Kreamer concerning custody and visitation, yet she did exactly the opposite of what Mr. Ferrara told her. Despite being aware of and having had brought to her attention the errors in the calculation of child support, Ms. Kreamer nevertheless charged Mr. Ferrara for the continuing erroneous calculations twice on November 25, 2003, once on December 1, 2003, once on December 3, 2003, once on December 24, 2003, and once on January 3, 2004.

(Internal record citation omitted.) Respondent argues these findings are in error because "the record demonstrates[ ] that Mr. Ferrara continually gave [Respondent] changing information pertinent to child support guidelines calculations, which [thereafter] required or substantially contributed to requiring recalculations of child support, with concomitant expense." We overrule Respondent's exceptions.

██ "Consistent with the standard of review for factual findings in attorney discipline cases, we have iterated that the judge 'may elect to pick and choose which evidence to rely upon.'" *Harris,* 403 Md. at 158, 939 A.2d at 742 (quoting *Attorney Grievance Comm. v. Harris,* 371 Md. 510, 543, 810 A.2d 457, 477 (2002)). With respect to these exceptions, the hearing judge did just that. Although Respondent testified that Mr. Ferrara called or stopped by Respondent's office several times to have his child support obligation recalculated by Respondent, Mr. Ferrara testified that he had Respondent recalculate his child support obligation on "five different occasions over a period of a month . . . and a half" because, "with exception of the last [calculation,] they were done incorrectly." Mr. Ferrara testified that through his own research and from conversations with his ex-wife, he learned that Respondent's calculations had been incorrectly performed, to Mr. Ferrara's detriment. Therefore, the hearing judge chose to believe the testimony of Mr. Ferrara concerning Respondent's represen-

tation of Mr. Ferrara in his divorce. We have reviewed the record and conclude that the hearing judge's factual findings are supported by clear and convincing evidence.

■ Respondent next excepts to the hearing judge's finding that Respondent "had asked the court to reset the [pre-trial] conference on a date that Mr. Ferrara was not available.... [Respondent] offered [the hearing judge] no explanation as to why she rescheduled the Pre–Trial Conference on a date when her client was unavailable, despite knowing of his conflict in advance." Respondent complains that "the record discloses [that Respondent] promptly made reasonable efforts to resolve the scheduling problem that arose, including communicating with the chambers of Judge Carr to reschedule the conference involved, but unknown to her at the time [as] opposing counsel had gone directly to the Assignment Office and obtained the February 20, 2004 date." Respondent's exception does not refute the factual findings in question. Indeed, the hearing judge's factual findings are supported by the evidence. The testimony of Mr. Ferrara indicates that he informed Respondent of his unavailability to attend any conferences from February 20 through February 27, 2004. Respondent, however, failed to confirm with the Assignment Office that the rescheduled pre-trial conference (from February 13, 2004) was not rescheduled on a day which Mr. Ferrara could not attend. Respondent contends that opposing counsel contacted the Assignment Office without her knowledge; however, Respondent should have taken a more proactive response to the rescheduling of the pre-trial conference. Respondent should have not just contacted the judge's chambers to reschedule the originally-scheduled February 13, 2004, conference, but should have also contacted the Assignment Office. The exception is overruled.

## V.

### THE COMPLAINT OF SARA LOUISE CALDARELLI

As to the complaint of Sara Louise Caldarelli, the hearing judge made the following findings of fact and conclusions of law:

In the matter of the complaint of Mrs. Caldarelli, Ms. Kreamer is charged with violating Rules 1.1, 1.2, 1.3, 1.4, 1.5, 8.1, and 8.4.

### FINDINGS OF FACT

On March 21, 2003, Mrs. Caldarelli retained Ms. Kreamer for representation in a divorce case. It should be noted that prior to retaining Ms. Kreamer, Mrs. Caldarelli had been represented by another lawyer, Zoe Lambros, Esquire, who ceased practicing law and moved out of state. At the time Mrs. Caldarelli retained Ms. Kreamer, Mrs. Caldarelli and her husband had already executed a Separation and Property Settlement Agreement. Ms. Kreamer used basically the same retainer/engagement agreement that she used with her other clients, again in which Ms. Kreamer agreed to "make every effort to expedite client's case promptly and efficiently according to the highest legal and ethical standards." Ms. Caldarelli gave Ms. Kreamer a $1,300.00 retainer fee. The Retainer Agreement has a date of July 3, 2003 for Mrs. Caldarelli's signature and a date of March 25, 2003 for Ms. Kreamer's signature. Ms. Kreamer made the astounding statement at trial that she did not consider herself as representing Mrs. Caldarelli until after July 3, 2003. She accepted the money and cashed the check. On April 14, 2003, Ms. Kreamer withdrew the $600.00 engagement fee from her escrow account. It defies belief for Ms. Kreamer to allege that she didn't consider herself as representing Mrs. Caldarelli until after July of 2003.

Long before she retained Ms. Kreamer to represent her, Mrs. Caldarelli had filed *pro se,* on August 12, 2002, a Complaint for Absolute Divorce in this court in Civil No. 12–C–02–2314. Mr. Caldarelli filed an Answer to Mrs. Caldarelli's *pro se* Complaint on September 9, 2002, admitting that the parties had been separated for more than two years and requesting that the court grant the divorce and that the Separation and Property Settlement Agreement be incorporated therein but not merged. Subsequent to that *pro se*

Answer, another Answer was filed by Mr. Caldarelli through a lawyer in the State of Georgia identified as T. Jeff Moore. It was undisputed that Mr. Moore was not a member of the Maryland Bar and did not request admission for the purpose of representing Mr. Caldarelli. Keep in mind that the subsequent Answer by the Georgia lawyer was filed five months before Mrs. Caldarelli retained Ms. Kreamer and was sitting in the court file. In that subsequent Answer, the Georgia lawyer on behalf of Mr. Caldarelli challenged service of process, jurisdiction and the execution of the Separation and Property Settlement Agreement. Additionally, the Answer by the Georgia attorney questioned the *bona fides* of the *pro se* Answer Mr. Caldarelli had filed some two months before on September 9th. There was also in the court file an Affidavit of Service attesting to service on Mr. Caldarelli of the Complaint at his address in Georgia. Also, the Answer filed by the Georgia lawyer was not signed by Mr. Caldarelli as required by ***Maryland Rule 9–202(a)***.

There was urgency to the matter at the time that Mrs. Caldarelli first met with Ms. Kreamer. Mrs. Caldarelli had received correspondence from the Georgia lawyer, Mr. Moore, basically stating that if she didn't move forward with the divorce in Maryland, Mr. Caldarelli would file in Georgia. Mrs. Caldarelli retrieved all of the papers and documents from her prior attorney and gave them to Ms. Kreamer within a week. The Georgia lawyer made it clear that unless the matter was pursued in Maryland he would file in Georgia. Despite the urgency of the matter as related to Ms. Kreamer by Mrs. Caldarelli, from March 20, 2003 until July 22, 2003, Ms. Kreamer did nothing to advance obtaining a divorce for Mrs. Caldarelli in the already pending case in this court. On July 22, 2003, Ms. Kreamer entered her appearance in the pending case in this court and she says, reviewed the Maryland court file. She, however, did nothing further until at least September 2, 2003. She never filed a Motion to Strike the Answer filed by the Georgia lawyer despite the fact that it was easy to

find out that he was not a member of the Maryland bar and that the Answer was not in proper form. When confronted with this, Ms. Kreamer's response was that she "intended" to argue later that the Answer should be stricken but never filed a Motion making that request.

Mr. Caldarelli down in Georgia stopped waiting. On June 27, 2003, Mrs. Caldarelli was served with a Complaint for a divorce and Summons filed in a Georgia court. Mrs. Caldarelli immediately gave the documents to Ms. Kreamer. There is no doubt that Ms. Kreamer had them. Thereafter, for reasons which were never explained, Ms. Kreamer prepared a *pro se* Answer for Mrs. Caldarelli to file in the Georgia divorce case. Ms. Kreamer does not deny preparing the *pro se* Answer and giving it to Mrs. Caldarelli. Ms. Kreamer testified that she had no idea what Mrs. Caldarelli would do with the pro se Answer. That is simply unworthy of belief. Ms. Kreamer prepared that pro se Answer knowing full well that Mrs. Caldarelli was going to send it to the Georgia court. Ms. Kreamer did no research on Georgia law and did not even consider any effect the filing of a pro se Answer in Georgia might have on the issue of whether or not Mrs. Caldarelli may have been consenting to the jurisdiction of the Georgia court. Ms. Kreamer continued to do absolutely nothing.

After the pro se Answer was filed in the Georgia case, on August 23, 2003, the Georgia court granted Mr. Caldarelli a divorce. At no time did Ms. Kreamer attempt to look into obtaining a Georgia lawyer to represent Mrs. Caldarelli or at least for Mrs. Caldarelli to consult. The judgment of the Georgia court did not incorporate the Property Settlement Agreement and in fact provided that both parties waived any right to any present or future right of action against the other with regard to property or debts. After being confronted with this *fait accompli* in Georgia, Ms. Kreamer compounded the problem by preparing and giving to Mrs. Caldarelli a *pro se* "Motion to Vacate the Judgment of Divorce" which Mrs. Caldarelli filed in the Georgia case.

The Separation and Property Settlement Agreement that Mrs. Caldarelli and Mr. Caldarelli had entered into and which clearly had been filed in the Harford County case and would have been, without objection, incorporated but not merged in a Maryland judgment, gave Mrs. Caldarelli certain benefits including alimony, the value of some life insurance policies, her marital portion of Mr. Caldarelli's pension and the marital home. Ms. Kreamer did nothing else on Mrs. Caldarelli's behalf other than to withdraw her appearance in the Harford County case on September 3, 2004. The Separation and Property Settlement Agreement was already in the Harford County file. It is inexplicable, knowing that a Georgia divorce had already been granted, for Ms. Kreamer to request a hearing in the Harford County case on September 2, 2003 to take divorce testimony. When she filed that, the clerk's office recognized that the matter was contested and so advised her. The notation by the clerk's office was that she was to submit a new request which she did on September 8, 2003, again simply asking for a hearing without disclosing the existence of the Georgia decree.

Throughout her representing of Mrs. Caldarelli, Ms. Kreamer, despite agreeing to and being required to, did not submit billing statements to Mrs. Caldarelli. The first statement that Mrs. Caldarelli received was in September of 2004. Again, as in other cases, Ms. Kreamer unreasonably charged Mrs. Caldarelli for such tasks as "file organization" and "accounting" which was nothing more than Ms. Kreamer trying to figure out how much to charge. It is obvious that Mr. Caldarelli was waiting for Mrs. Caldarelli to finalize the Maryland case and that he only filed in Georgia when that did not happen. Ultimately, Mrs. Caldarelli discharged Ms. Kreamer with good reason. She then retained J. Richard Moore, Esquire to represent her and to try to salvage something out of the mess in Georgia. Through Mr. Moore's efforts, Mrs. Caldarelli was able to get the house and some value from the life insurance policies. She, however, lost the alimony that was payable to

her under the agreement and a marital portion of Mr. Caldarelli's pension. Her loss of these things was a direct result of Ms. Kreamer's abominable handling of her case.

## CONCLUSIONS OF LAW

By clear and convincing evidence, Ms. Kreamer violated the rules of professional conduct as charged by Petitioner. She incompetently represented Mrs. Caldarelli in violation of Rule 1.1 by not exhibiting the thoroughness and preparation reasonably necessary for the representation, by her failure to move to strike the Answer prepared by the Georgia lawyer in the Maryland case; by not moving forward with the Maryland case; by preparing a *pro se* Answer for Mrs. Caldarelli to file in the Georgia proceedings without any consideration or research as to the effect of such a filing and by failing to do anything on Mrs. Caldarelli's behalf after she found out that the Georgia divorce had been granted.

Ms. Kreamer violated Rule 1.2 by failing to abide by Mrs. Caldarelli's objectives in the representation which was to move the Maryland case forward. Recall that the case had already been filed *pro se* in Maryland months before her retention of Ms. Kreamer. There was a Property and Separation Agreement in place and everything had been worked out.

Ms. Kreamer's failure to purse the Maryland matter on Mrs. Caldarelli's behalf upon being retained in March of 2003, demonstrates a clear lack of diligence on her part in violation of Rule 1.3.

Ms. Kreamer violated Rule 1.4 by failing to provide Mrs. Caldarelli with accurate billing statements during the representation.

Ms. Kreamer violated Rule 1.5 by unreasonably charging Mrs. Caldarelli for things which are part of normal overhead such as file organization and accounting.

I additionally find by clear and convincing evidence that Ms. Kreamer violated Rule 8.4(c) when she misrepresented

that her representation of Mrs. Caldarelli did not begin until July 3, 2003 when she had previously accepted the retainer fee, withdrawn a portion of it as a non-refundable engagement fee and had received all of the documents that Mrs. Caldarelli had. Her neglect of Mrs. Caldarelli's case and lack of competence as well as her misrepresentations is also conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

(Internal record citations and footnote omitted.)

Respondent raises two exceptions to the hearing judge's factual findings. First, Respondent excepts to the judge's finding that "[i]t defies belief for [Respondent] to allege that she did not consider herself representing Mrs. Caldarelli until after July of 2003." Respondent contends that while "it may well have been wiser for Respondent to have refrained until after receipt of a copy of the contract signed by Mrs. Caldarelli before withdrawing the 'engagement fee' portion of the retainer . . ., the withdrawal does not do away with the need for Mrs. Caldarelli's signature to create a viable contract in this instance." In other words, Respondent claims that her attorney-client relationship with Mrs. Caldarelli did not begin until Mrs. Caldarelli signed the retainer agreement on July 3, 2003. We overrule this exception.

 An attorney-client relationship is formed when:
> 1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and . . .
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services.

*Attorney Grievance Comm'n v. Brooke*, 374 Md. 155, 174, 821 A.2d 414, 425 (2003) (quoting Restatement (Third) of the Law Governing Lawyers § 14 (2000)); *accord Attorney Grievance Comm'n v. Siskind*, 401 Md. 41, 72, 930 A.2d 328, 346 (2007). "An attorney-client relationship [ ] does not require an explicit agreement." *Brooke*, 374 Md. at 175, 821 A.2d at 425. Rather, "[t]he relationship may arise by implication from a client's

reasonable expectation of legal representation and the attorney's failure to dispel those expectations." *Id.* In the case *sub judice,* Mrs. Caldarelli manifested her intent that Respondent provide legal services in Mrs. Caldarelli's divorce, on or about March 25, 2004, by (1) handing over to Respondent the documents and papers necessary to the representation, and (2) remitting the $1,300.00 retainer fee. While the written retainer agreement was not signed by Mrs. Caldarelli until July 3, 2003, Mrs. Caldarelli clearly expressed her desire to have Respondent provide her legal representation in March 2003. Respondent's actions in the acceptance of the papers and fees manifest Respondent's intent to provide legal representation to Mrs. Caldarelli. In addition, Respondent's withdrawal of the $600 non-refundable engagement fee on April 14, 2003, further evidences Respondent's intent to provide Mrs. Caldarelli legal representation. Therefore, we hold that the hearing judge was correct in finding that Respondent had established an attorney-client relationship prior to July 3, 2003.

Respondent next excepts to what the Respondent perceives as "attribution to her of responsibility for activities and events which were initiated and/or occurred long before her relationship with Mrs. Caldarelli." Respondent complains that "[i]t was not [R]espondent who created all the problems that Mrs. Caldarelli had when she first approached Respondent." Respondent states that she was not the one "who permitted Mrs. Caldarelli's deteriorated martial situation to languish, literally for years, without any effective measures being undertaken;" who "lost or misplaced a Separation and Property Settlement Agreement that had been reached between Mrs. Caldarelli an d her husband;" or, "who failed to record a deed for the former Caldarelli marital residence conveying Mr. Caldarelli's interest therein to [Mrs. Caldarelli]."

Respondent's exception misses the point of the hearing judge's findings and instead attempts to place the responsibility on Mrs. Caldarelli for Respondent's failure to act appropriately on Mrs. Caldarelli's case. The record shows that, despite accepting Mrs. Caldarelli's documents and retainer fee on or about March 25, 2003, and then withdrawing the $600

non-refundable legal engagement fee on April 14, 2003, Respondent did little to advance Mrs. Caldarelli's divorce through the court system. It was not until July 22, 2003, that Respondent entered her appearance in the pending divorce case, despite Mrs. Caldarelli having expressed urgency in resolving the case. At their initial meeting in March, Mrs. Caldarelli had informed Respondent that she had recently received correspondence from Mr. Caldarelli's lawyer in Georgia stating that if she did not move the divorce in Maryland forward, Mr. Caldarelli would seek a divorce in Georgia. Nevertheless, Respondent did not act upon Mrs. Caldarelli's case. Accordingly, the exception is overruled.

Respondent next excepts to the hearing judge's findings that:

Thereafter, for reasons which were never explained, Ms. Kreamer prepared a *pro se* Answer for Mrs. Caldarelli to file in the Georgia divorce case. Ms. Kreamer does not deny preparing the *pro se* Answer and giving it to Mrs. Caldarelli. Ms. Kreamer testified that she had no idea what Mrs. Caldarelli would do with the *pro se* Answer. That is simply unworthy of belief. Ms. Kreamer prepared that *pro se* Answer knowing full well that Mrs. Caldarelli was going to send it to the Georgia court. Ms. Kreamer did no research on Georgia law and did not even consider any effect the filing of a *pro se* Answer in Georgia might have on the issue of whether or not Mrs. Caldarelli may have been consenting to the jurisdiction of the Georgia court. Ms. Kreamer continued to do absolutely nothing.

After the *pro se* Answer was filed in the Georgia case, on August 23, 2003, the Georgia court granted Mr. Caldarelli a divorce. At no time did Ms. Kreamer attempt to look into obtaining a Georgia lawyer to represent Mrs. Caldarelli or at least for Mrs. Caldarelli to consult. The judgment of the Georgia court did not incorporate the Property Settlement Agreement and in fact provided that both parties waived any right to any present or future right of action against the other with regard to property or debts. After being confronted with this *fait accompli* in Georgia, Ms. Kreamer

compounded the problem by preparing and giving to Mrs. Caldarelli a *pro se* "Motion to Vacate the Judgment of Divorce" which Mrs. Caldarelli filed in the Georgia case.

(Internal record citations omitted.) Respondent claims these findings are in error because "it is undisputed that [Respondent] promptly told Mrs. Caldarelli that she needed a lawyer in Georgia." Respondent contends that she should not be held responsible for Mrs. Caldarelli's failure to obtain legal representation in Georgia. Respondent's exception again misses the point of the hearing judge's factual findings. The hearing judge simply stated that he did not believe Respondent's testimony that she did not know that Mrs. Caldarelli would file the *pro se* Answer in Georgia when she prepared and gave the document to Mrs. Caldarelli. As we have previously stated, the hearing judge "may elect to pick and choose which evidence to rely upon." *Harris,* 403 Md. at 158, 939 A.2d at 742. In this case, the hearing judge did not believe Respondent's version of events. The exception, therefore, is overruled.

Respondent excepts to the hearing judge's finding that Respondent sought a hearing in the Circuit Court for Harford County in order to take testimony with regard to the divorce complaint filed in that court without disclosing to the Court the existence of the Georgia divorce decree. Respondent contends that her "action in requesting a hearing in the Maryland divorce case is hardly inexplicable" as "she was trying to challenge the Georgia divorce in Maryland." She argues that while such action "may not have been the most appropriate way to accomplish what she sought to do, ... and maybe a tactical error, [ ] it should not be held to constitute unethical behavior." Respondent's exception does not address the underlying factual finding; rather, it attempts to justify her decision to request a circuit court hearing after a Georgia court had issued a divorce decree, terminating the Caldarelli's marriage. Thus, the exception is overruled.

■■■ Respondent next excepts to the hearing judge's finding that "[t]he Separation and Property Settlement Agreement that Mrs. Caldarelli and Mr. Caldarelli had entered into

and which clearly had been filed in the Harford County case and would have been, without objection, incorporated but not merged in a Maryland judgment, gave Mrs. Caldarelli certain benefits including alimony, the value of some life insurance policies, her marital portion of Mr. Caldarelli's pension and the marital home." Specifically, Respondent excepts to the hearing judge's use of the phrase "gave Caldarelli certain benefits," claiming that "it appears to be an expression of the hearing judge's opinion or prediction as to what the lower court would have done with respect to certain provisions of the Caldarelli settlement agreement, rather than a factual finding." The duty of the hearing judge in attorney grievance cases is to consider the evidence placed before him or her and render an opinion regarding the factual findings and conclusions of law in that case. The hearing judge did just that in this case. We overrule this exception.

Last, Respondent excepts to the hearing judge's use of the adjective "abominable" when referring to Respondent's handling of the case. Respondent complains that the disparaging adjective would tend to put Respondent in an unfavorable light. In the instant case, we do not find the hearing judge's use of "abominable" to be inappropriate or unreasonable. In the instant case, Mrs. Caldarelli lost alimony and the martial portion of her husband's pension as a result of Respondent's failure to represent Mrs. Caldarelli in a competent fashion. Under the circumstances, the hearing judge's characterization of Respondent's handling of Mrs. Caldarelli's affairs is both reasonable and consistent with the facts. We overrule this exception.

## VI.

### THE COMPLAINT OF MICHAEL D. BOONE

As to the complaint of Michael D. Boone, the hearing judge made the following findings of fact and conclusions of law:

In the Boone matter, Respondent is charged with violating Rules 1.1, 1.3, 1.4, 1.16 and 8.4.

## FINDINGS OF FACT

On May 12,2003, Mr. Boone retained Ms. Kreamer to represent him in a separation and divorce matter. He paid Ms. Kreamer a $2,000.00 retainer of which $600.00 was considered to be a non-refundable engagement fee. Thereafter he was to be charged at the rate of $150.00 per hour plus expenses. Mr. Boone was to be billed on a "monthly or quarterly basis as applicable" recapping the services rendered and expenses advanced. Ms. Kreamer agreed that she would make every effort to expedite Mr. Boone's case promptly and efficiently "according to the highest legal and ethical standards." Despite his inquiries, during Ms. Kreamer's representation of Mr. Boone between May 12, 2003 and March of 2004, he never received a billing statement.

A Master's Hearing was scheduled for January 22, 2004 at 9:00 a.m. Mr. Boone was present. Ms. Kreamer, however, failed to appear in a timely fashion for the Master's Hearing. She later appeared 30 minutes late. Her explanation for not appearing timely was that she was involved in another domestic matter which had been scheduled for that same morning but which Ms. Kreamer thought was scheduled for the afternoon.

On June 12, 2004, Judge Carr issued an Order fixing child support and a wage lien against Mr. Boone in the amount of $3,000.00 per month. Mr. Boone had no prior knowledge of that Order and in fact learned of it from his estranged wife. Ms. Kreamer did not provide a copy of the Order to Mr. Boone until September 9, 2004. He had no idea that the matter was before Judge Carr and was not told by Ms. Kreamer. In the interim, between Judge Carr's Order of June 12, 2004 and Mr. Boone's receipt of a copy of the Order on September 9, 2004, he left several messages for Ms. Kreamer asking her to contact him but none were returned.

There was some exchange between Mr. Boone and Ms. Kreamer and Mrs. Boone and her attorney concerning a possible settlement. For reasons which Ms. Kreamer could

not explain, without consulting or reviewing the matter with Mr. Boone, Ms. Kreamer submitted a proposed Property and Separation Agreement to opposing counsel.

There was a conference scheduled before Judge Whitfill on August 11, 2004. Even though she was still counsel of record, Ms. Kreamer failed to appear. Mr. Boone appeared *pro se*. In point of fact, Mr. Boone was so disgusted with Ms. Kreamer's actions that he decided to go to the August 11th conference on his own.

## CONCLUSIONS OF LAW

By clear and convincing evidence, I find that Ms. Kreamer violated the rules of professional conduct as charged. She incompetently represented Mr. Boone in violation of Rule 1.1 by not exhibiting thoroughness and preparation reasonably necessary for representation of Mr. Boone by her failure to timely appear for the Master's hearing; by failing to advise Mr. Boone of Judge Carr's Order of June 12, 2004; and by failing to appear at the conference before Judge Whitfill on August 11, 2004 even though she was still counsel of record.

In addition, Ms. Kreamer's failure to advise Mr. Boone of Judge Carr's Order of June 12, 2004, for over three months demonstrates an appalling lack of diligence in violation of Rule 1.3.

She violated Rule 1.4 by her failure to communicate with Mr. Boone and keep him informed of the status of the matter, despite Mr. Boone's efforts to find out and discuss with Ms. Kreamer the Order of June 12, 2004, which he learned from his wife. Further, throughout the representation, Ms. Kreamer did not provide Mr. Boone with billing statements on how his retainer was being used.

She violated Rule 1.16(d) by failing to appear at the August 11, 2004 hearing. She was still counsel of record at that time and had a duty to appear in court, having been given appropriate notification.

Additionally, her failure to appear in court; her failure to communicate with Mr. Boone concerning the Order for three months; and her failure to consult and discuss with Mr. Boone any settlement proposal before submitting it to opposing counsel was clearly conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

(Internal record citations omitted.)

Respondent first excepts to the hearing judge's findings that

A Master's Hearing was scheduled for January 22, 2004 at 9:00 a.m. Mr. Boone was present. Ms. Kreamer, however, failed to appear in a timely fashion for the Master's Hearing. She later appeared 30 minutes late. Her explanation for not appearing timely was that she was involved in another domestic matter which had been scheduled for that same morning but which Ms. Kreamer thought was scheduled for the afternoon.

Respondent contends that while she was late in arriving at the Master's hearing on January 22, 2004, because of her confusion over her hearing schedule for that day, she "does not believe her lateness in any way occasioned any detriment to her client." Respondent points out that "[a]t the close of the hearing[,] the [M]aster complimented both counsel for their presentations." Respondent's exception does not address the factual finding of the hearing judge; rather, the exception attempts to explain why Respondent's lateness did not amount to a violation of Rule 1.1 (Competence). In fact, Respondent admits to arriving late at the pre-trial conference on January 22, 2004. Thus, we overrule the exception.

Next, Respondent excepts to the hearing judge's finding that Respondent did not inform Mr. Boone about the June 12, 2004, Order fixing child support and entry of a wage lien against him in the amount of $3,000.00 per month. Respondent contends that she attempted to inform Mr. Boone of the Order in a series of letters dated June 29, July 19, 23, 28, and August 3 and 25, 2004, but that Mr. Boone would not respond to her efforts to communicate with him. Respondent claims

that the court file contains this above-mentioned correspondence. It is clear from the opinion that the hearing judge did not believe Respondent's version of the events concerning the June 12, 2004, Order. Again, it is within the hearing judge's province to pick and choose the evidence to believe. The hearing judge was not required to rely upon the testimony of Respondent. In this case, the hearing judge did not believe that Respondent informed or attempted to inform Mr. Boone of the child support order. In addition, a review of the record discloses only one letter from Respondent to Mr. Boone, dated August 25, 2004. We, therefore, overrule the exception.

Respondent next excepts to the hearing judge's finding that Respondent, without consulting or informing Mr. Boone, submitted a proposed Property and Settlement Agreement to Mrs. Boone and her counsel. Respondent contends that "[i]f in fact Respondent submitted to opposing counsel a proposal of which Mr. Boone was not made aware, the record does not establish that Mr. Boone thereby was adversely affected in any way." Respondent's exception does not address the factual finding. The hearing judge did not make any findings as to whether Mr. Boone was adversely affected by Respondent's actions. Rather, the hearing judge found that Respondent submitted a proposal to opposing counsel without informing or consulting with Mr. Boone. Respondent's explanation does not contradict this factual finding. The exception is overruled.

Last, Respondent excepts to the hearing judge's finding that she failed to appear at the August 11, 2004, conference even though she was still counsel of record. Respondent contends that the record indicates that "Mr. Boone had effectively discharged her prior to the August 11, 2004, conference." Respondent's exception is overruled. On August 11, 2004, Respondent was still counsel of record for Mr. Boone. The hearing judge made no findings that Mr. Boone terminated his relationship with Respondent prior to August 11, 2004. If Respondent believed that Mr. Boone effectively terminated the attorney-client relationship prior to August 11, 2004, Respondent should have moved to strike her appearance as his counsel, prior to the hearing. She failed to do so.

## VII.

### *THE COMPLAINT OF PATRICIA GOODWIN*

As to the complaint of Patricia Goodwin, the hearing judge made the following findings of fact and conclusions of law:

With regard to the matter of Patricia Goodwin, Ms. Kreamer is charged with violating Rules 1.1, 1.3, 1.4, 3.3, 8.1, and 8.4.

### *FINDINGS OF FACT*

At the outset it should be noted that the testimony of Mrs. Goodwin was done by virtue of a *de bene esse* deposition taken on June 26, 2007, after appropriate notice. My findings of fact herein are based not just on the documents presented, but also the testimony of Mrs. Goodwin as reflected in her deposition. Mrs. Goodwin is disabled and cannot drive. In addition, her husband is very ill. Mrs. Goodwin appeared in this court on one of the prior hearing dates which was continued but could not appear for the rescheduled trial which began on August 13, 2007 because of her medical condition and her husband's medical condition.

On November 2, 2000, Mrs. Goodwin retained Ms. Kreamer to handle her divorce case. She paid Ms. Kreamer a retainer of $650.00 of which $260.00 was considered to be a non-refundable engagement fee. Mrs. Goodwin was to be billed on an hourly basis at the rate of $130.00. Ms. Kreamer was to submit bills to Mrs. Goodwin on a monthly or quarterly basis and agreed to "make every effort to expedite client's case promptly and efficiently according to the highest legal and ethical standards".

On November 15, 2000, Ms. Kreamer filed a Complaint for Absolute Divorce on behalf of Mrs. Goodwin in the Circuit Court for Cecil County. Mr. Goodwin was served on February 13, 2001. In March of 2001, Ms. Kreamer prepared a request for Order of Default to file in the Circuit Court for Cecil County. However, the request for Order of Default was never filed with the court by Ms. Kreamer. When Mrs. Goodwin inquired of Ms. Kreamer as to the

status of the request for Order of Default, Ms. Kreamer misrepresented to her that she was "waiting on the judge to sign it". Not being satisfied with that explanation, Mrs. Goodwin contacted the Circuit Court for Cecil County and learned that the Order of Default had never been filed. When Mrs. Goodwin confronted Ms. Kreamer about why the Order of Default had never been filed with the court, instead of giving her a direct answer that she had simply neglected to do it, Ms. Kreamer told Mrs. Goodwin that another request had to be filed because, as Ms. Kreamer put it, the date on the March 2001 request was too old. Instead of immediately proceeding with the Request for Order of Default, Ms. Kreamer did nothing until August 7, 2001, when she prepared a second Request for Order of Default. However, she did not file that Request for Order of Default with the court until seven months later on March 13, 2002.

Ms. Kreamer's explanation as to why she was so dilatory in filing the requests for Orders of Default was that she "wanted to wait" to see if Mr. Goodwin would sign over his interest in the marital home to Mrs. Goodwin. However, that explanation was clearly contradicted by Mrs. Goodwin as it was paramount to Mrs. Goodwin that the matter move along promptly so that the matter of the residence could be resolved. Ms. Kreamer had to have known that Mr. Goodwin had been served when she prepared the March 2001 Request for Default. She later tried to explain that in August of 2001, when she prepared the second Order of Default, she contacted the court to find out if Mr. Goodwin had been served. When she was questioned as to why she could prepare an Order of Default in March of 2001 which, of course, would require that the Defendant had been served and then turn around later to find out whether the Defendant had been served, Ms. Kreamer described it as that she could prepare all the documents necessary at the beginning of the representation. That is clearly an explanation that is unworthy of belief. Again, when asked why she choose to prepare a second Order of Default, Ms. Kreamer testified

that she did so because she simply choose to. Again it must be kept in mind that even the second Order of Default was not filed until March 13, 2002.

Ms. Kreamer's attempted explanation that she held off filing an Order of Default until March of 2002, that she was trying to get Mr. Goodwin to sign over the home to Mrs. Goodwin is simply not true. Ms. Kreamer also testified that she was under the impression that the parties had reconciled. That is clearly not true. On March 14, 2002, the day after she ultimately filed an Order of Default, she sent a letter to Mrs. Goodwin explaining that she had "misunderstood" that the parties had reconciled. The credible testimony was that there was never any reconciliation or discussion of reconciliation between Mr. Goodwin and Mrs. Goodwin since they separated in October of 1999. While it is true they may have had some incidental contact, there was clearly never any reconciliation and Ms. Kreamer took no steps to determine if that was true. It is also a mystery as to why she even felt there had been a reconciliation.

One of Mrs. Goodwin's primary concerns was to get the former marital residence in her name. A deed to accomplish this was prepared by Respondent. On October 14, 2003, the Goodwins executed the deed conveying Mr. Goodwin's interest in the marital home to Mrs. Goodwin. The Goodwins then took the deed, prepared by Respondent, to a bank in Rising Sun, Maryland to have it notarized. The notary did not sign as a witness to either of the Goodwins' signatures. Nevertheless, by letter of October 17, 2003, Mrs. Goodwin sent the deed to Respondent along with a check in the amount of $275.00 for the preparation of the deed and the cost of recording. The Respondent deposited the $275.00 check in her escrow account on October 22, 2003. Sometime thereafter, the Respondent signed as having witnessed both of the Goodwins' signatures even though she was not present when the deed was executed. A substantial period of time passed and ultimately Mrs. Goodwin contacted Ms. Kreamer to see why the matter had not moved forward. In response to her inquiry, Ms. Kreamer

told Mrs. Goodwin that she had not recorded the deed because she had not actually witnessed them executing the deed and would "get in trouble". Ms. Kreamer told Mrs. Goodwin that another deed would have to be prepared and executed. Mrs. Goodwin did not receive the "new" deed to be re-executed by her and her husband until May of 2004.

Ms. Kreamer also told Mrs. Goodwin that not only would the deed have to be re-executed but that she would need Mr. and Mrs. Goodwin to execute an exemption certificate to save on recordation costs. The exemption certificate required Mrs. Goodwin to attest under oath that the property would be her principal residence. There was in fact no reason for this as the deed was for no consideration because it was a transfer between spouses and no transfer tax would be due. Ms. Kreamer's suggestion that the matter was additionally delayed because of this Affidavit is simply not credible. In addition, Ms. Kreamer knew at the time that Mrs. Goodwin was not living at that residence and intended to sell it. Nevertheless, she told Mrs. Goodwin that such an Affidavit would have to be executed.

Although Ms. Kreamer had prepared another deed, the deed actually recorded was the first one that had been executed on October 14, 2003. The deed was not recorded until June 24, 2004 and was recorded bearing Ms. Kreamer's signature as a witness to the Goodwins' signatures. Ms. Kreamer's explanation for this was that she had signed on the wrong line because she is left handed is simply not credible.

During the time that Ms. Kreamer represented Mrs. Goodwin, Mrs. Goodwin continually asked Ms. Kreamer for the status of the divorce matter. Ms. Kreamer never responded or gave an accurate answer to Mrs. Goodwin as to why she had never filed the Request for Order of Default that had been prepared in March of 2001. In addition she failed to timely file the second Order of Default in August of 2001 and likewise failed to respond to Mrs. Goodwin's request concerning the progress and status of the case. Ms. Kreamer also did not timely respond to Mrs. Goodwin's

continuing inquiries as to why the deeds concerning the transfer of the residence had never been recorded. Ms. Kreamer also failed to communicate with Mrs. Goodwin regarding the cancellation of her scheduled hearing. Mrs. Goodwin went to the Circuit Court on April 17, 2002 with her mother as a witness thinking there would be a hearing on the divorce. Actually the hearing had been cancelled, but Ms. Kreamer never advised Mrs. Goodwin that it had been cancelled. Ms. Kreamer's billings statements show that on April 15, 2002, she called to cancel the Master's Hearing, however, there is no corresponding contemporaneous entry that she notified Mrs. Goodwin of that fact. Ms. Kreamer's own billing statements reflect that on April 17, 2002, she in fact got a call from Mrs. Goodwin inquiring as to what happened with regard to the hearing.

Throughout the some three and one half years that Ms. Kreamer represented Mrs. Goodwin, she did not submit periodic billings statements. The first billing statement that Mrs. Goodwin received was dated May 27, 2004, showing a balance due of $1,627.32. On June 23, 2004, Ms. Kreamer submitted to Mrs. Goodwin a second invoice which purported to list exactly how much time was spent for each task. A careful review of the June 23, 2004 invoice sent by Ms. Kreamer shows several breaks in her representation of Mrs. Goodwin. Specifically there was a two month break between November 15, 2000 and January 10, 2001; a four month break between March 30, 2001 and August 1, 2001; a four month break between October 16, 2001 and February 14, 2002; a three month break between September 20, 2002 and December 10, 2002; a ten month break between January 3, 2003 and October 1, 2003; and a two month break between October 22, 2003, the date she deposited the $275.00 check in her escrow account for the deed, and December 19, 2003. Thereafter there was another five month break between December 19, 2003 and May 5, 2004, when Ms. Kreamer finally called Mrs. Goodwin concerning the residence Affidavit that she insisted had to be executed in order to record the October 14, 2003 deed.

A careful review of Ms. Kreamer's June 23, 2004, invoice to Mrs. Goodwin shows that Ms. Kreamer charged Mrs. Goodwin for accounting services which Ms. Kreamer described as "having an employee of hers or herself figure out how much time she had spent representing Mrs. Goodwin." She did not keep separate time sheets for Mrs. Goodwin. She tried to construct bills from notations she made in calendars. For example, she billed Mrs. Goodwin for 35 minutes on October 4, 2004 for accounting. She included in that notation attempts to call clients or letters to client but, when asked for a break down, she w as unable to provide it because she did not have contemporaneous records. She did the same thing to Mrs. Goodwin on March 12, 2002 and April 4, 2004, billing her a total of an hour and five minutes for accounting.

## *CONCLUSIONS OF LAW*

By her conduct in the Goodwin matter, I find by clear and convincing evidence that Ms. Kreamer violated Rules 1.1, 1.3, 1.4, and 8.4(a), (c) and (d). It should be noted that Bar Counsel withdrew the allegations concerning Rules 3.3 and 8.1

Ms. Kreamer incompetently represented Mrs. Goodwin in violation of Rule 1.1 by not exhibiting the thoroughness and preparation reasonably necessary for the representation by her failure to understand what was required in order to transfer the marital home to Mrs. Goodwin. Ms. Kreamer lacked any comprehension about the fact that the deed was for no consideration because it was an inter-spousal transfer and that no transfer of taxes would be due. Ms. Kreamer insisted that the signatures on the deed were no good and the deed would have to be re-executed when in fact it had already been notarized. She failed to file the March 2001 Request for Order of Default and the August 2001 Request for Order of Default in any kind of a timely fashion. This clearly demonstrates a lack of diligence in violation of Rule 1.3.

Ms. Kreamer violated Rule 1.4 by failing to maintain communication with Mrs. Goodwin throughout the representation concerning the progress of her case and failing to respond to Mrs. Goodwin's inquiries. She also failed to advise Mrs. Goodwin concerning the Master's Hearing which was scheduled for April 17, 2002 and failing to advise her in a timely manner concerning the situation concerning the deed. She also failed to submit regular billings statements to Mrs. Goodwin throughout the representation even though she was obligated to do so.

She also clearly violated Rule 8.4(c) when she deliberately misrepresented to Mrs. Goodwin that she was "waiting on a judge to sign" the March 2001 Request for Order of Default when in fact it had never been filed. Her lack of diligence and competence, as well as her misrepresentations to Mrs. Goodwin, also amount to conduct prejudicial to the administration of justice in violation of Rule 8.4(d).

Respondent submits nine exceptions to the hearing judge's findings as to Mrs. Goodwin's complaint, several of which we shall combine and address together.

First, Respondent excepts to the hearing judge's finding that she was dilatory in filing requests for an order of default on behalf of Mrs. Goodwin. Respondent contends that the delay in filing the requests for an order of default was not due to her, but rather due to instructions from Mrs. Goodwin "to refrain from doing anything that might cause Mr. Goodwin to change his mind" regarding the conveyance of the marital home to Mrs. Goodwin. Respondent states: "It took [Respondent] substantial time and effort ... to even send a copy of a default request to Mr. Goodwin and to tell him it would be filed, if he did not carry out his agreement." We shall overrule Respondent's exception. As we have previously stated and as Respondent points out in her exception, the hearing judge "is empowered to pick and choose whom and what he will or will not believe and he need not explain his decision in those regards." In the instant matter, the hearing judge considered and accepted the testimony of Mrs. Goodwin over Respondent's version of the events.

Next, Respondent excepts to the hearing judge's finding that Respondent signed the Goodwins' deed as a witness to either of the Goodwins' signatures. The hearing judge stated that Respondent's "explanation . . . that she had signed on the wrong line because she is left-handed is simply not credible." Respondent contends that her signature on the witness line was accidental and her actions after her signing on the witness line support her contention. Specifically, Respondent asserts that after mistakenly signing the witness line, she told Mrs. Goodwin that another deed would have to be prepared and executed due to her mistake. As we have previously stated, it is within the province of the hearing judge to consider and either accept or reject the evidence presented before him. In this matter, the hearing judge did not accept Respondent's explanation of the error, especially in light of her knowingly filing the deed with her signature on the witness line. Her actions in recording the deed were inconsistent with her statement that a new deed needed to be prepared.

Respondent next excepts to the hearing judge's finding that Respondent wrongly told Mrs. Goodwin that an exemption certificate would need to be executed so that Mrs. Goodwin could save on recordation costs. The hearing judge explained that there was no need for the certificate because "the deed was for no consideration because it was a transfer between spouses and [thus] no transfer tax was due." In addition, the hearing judge noted that such an affidavit could not be used because Mrs. Goodwin was not living at that residence and intended on selling it as soon as she received the new deed. We overrule Respondent's exception. The hearing judge was correct in asserting that Respondent was wrong with regard to the requirements for recording a deed between spouses.

The transfer of the martial home from Mr. Goodwin to Mrs. Goodwin was exempt from both recordation taxes and transfer taxes under Maryland Tax–Property Article §§ 12–108(d) and 13–207(a)(3), respectively. Section 12–108(d), entitled "Transfers between spouses," provides:

An instrument of writing that transfers the property between spouses or former spouses is not subject to recordation taxes.

Md.Code (1985, 2007 Repl.Vol.). Section 13–207(a)(3), entitled "Exemptions parallel to recordation tax exemptions," provides that "[a]n instrument of writing is not subject to transfer tax to the same extent that it is not subject to recordation taxes under[ ] § 12–108(d) of this article (Transfer between spouses)."

Under the plain language of these sections, it is clear that Mrs. Goodwin did not need to execute an affidavit professing her intent to primarily reside in the martial house to be eligible for the transfer and recordation tax exemption. Indeed, the statutory provision manifests no other requirement for the exemption than the current or former marriage of the transferor and transferee. Therefore, it is clear that Respondent's legal advice concerning the transfer of the martial home from Mr. Goodwin to Mrs. Goodwin was incorrect.

Respondent also excepts to the hearing judge's finding that Respondent did not keep Mrs. Goodwin informed and provided inaccurate answers as to the status of the divorce matter. Respondent contends that "there may have been an occasion when Respondent overlooked reporting an item of information regarding the case, she generally kept Mrs. Goodwin reasonably appraised of significant developments." Respondent claims that Mrs. Goodwin knew Respondent was holding the requests for an order of default pending Mrs. Goodwin's consent to file them with the Circuit Court. We have previously addressed Respondent's contention. The hearing judge rejected Respondent's version of the events concerning the filing of the request for an order of default, which was within his province to do so. Therefore, the exception is overruled.

Last, Respondent excepts to the hearing judge's finding that Respondent did not submit periodic billing statements to Mrs. Goodwin during the course of her representation. The hearing judge noted that, according to the retainer agreement between Respondent and Mrs. Goodwin, Respondent "was to

submit bills to Mrs. Goodwin on a monthly or quarterly basis." The hearing judge then stated the following concerning Respondent's failure to submit periodic billing statements to Mrs. Goodwin:

> Throughout the some three and one half years that Ms. Kreamer represented Mrs. Goodwin, she did not submit periodic billings statements. The first billing statement that Mrs. Goodwin received was dated May 27, 2004, showing a balance due of $1,627.32. On June 23, 2004, Ms. Kreamer submitted to Mrs. Goodwin a second invoice which purported to list exactly how much time was spent for each task. A careful review of the June 23, 2004 invoice sent by Ms. Kreamer shows several breaks in her representation of Mrs. Goodwin. Specifically there was a two month break between November 15, 2000 and January 10, 2001; a four month break between March 30, 2001 and August 1, 2001; a four month break between October 16, 2001 and February 14, 2002; a three month break between September 20, 2002 and December 10, 2002; a ten month break between January 3, 2003 and October 1, 2003; and a two month break between October 22, 2003, the date she deposited the $275.00 check in her escrow account for the deed, and December 19, 2003. Thereafter there was another five month break between December 19, 2003 and May 5, 2004, when Ms. Kreamer finally called Mrs. Goodwin concerning the residence Affidavit that she insisted had to be executed in order to record the October 14, 2003 deed.

Respondent contends that while she may not have submitted statements to Mrs. Goodwin as often as the retainer agreement provided, she did submit billing statements to Mrs. Goodwin periodically. We find that Respondent's exception is without merit. Respondent does not contest the hearing judge's findings that she did not submit billing statements as often as she promised she would do; indeed, she admits to failing to submit billing statements to Mrs. Goodwin as often as she had promised, according to the terms of the retainer agreement. Respondent, however, attempts to mitigate her contractual failure by noting that she did submit at least two

billing statements during the course of the representation.[18] The exception is therefore overruled.

## VIII.

### EXCEPTION REGARDING HEARING JUDGE'S CONCLUSION THAT RESPONDENT'S FEES AND BILLING PRACTICES VIOLATE THE MRPC

Respondent excepts to the hearing judge's conclusion that her billing practices violated provisions of the MRPC. The hearing judge concluded that Respondent's practice of billing clients for time spent completing her time sheets—what the Respondent referred to as "accounting services"—violated MRPC 1.5. The hearing judge opined that "[t]he se are matters of overhead in any law office." Respondent contends that there is "substantial authority to the effect that a lawyer is entitled (and in some instances even required) to include in his or her billings time spent in determining the amount of the fee involved and in preparing his or her request for payment."

The issue of whether an attorney may charge a client for "accounting services" is of first impression in this State. Indeed, our research indicates that no other court in this country has published an opinion dealing with this very issue. Moreover, the American Bar Association's Model Rules of Professional Conduct provide no specific guidance concerning attorneys' ability to charge clients separately for this service.

Respondent relies on five cases: *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct.

---

18. In addition, Respondent argues that the hearing judge should not have complained about both Respondent's "breaks in representation" and about Respondent's failure to submit statements during those "breaks." Respondent points out: "[I]f the intervals alluded to [by the hearing judge] were in fact 'breaks' in representation, there would seem to be no need to submit billings" to Mrs. Goodwin. We agree that if Respondent did not perform any services during certain intervals, there would be no reason to issue a billing statement. This argument, however, does not persuade us to sustain the exception because Respondent admits to failing to live up to her contractual obligations to issue Mrs. Goodwin either monthly or quarterly billing statements.

3088, 92 L.Ed.2d 439 (1986); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *White v. New Hampshire Dep't of Employment Security*, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169 (4th Cir.1994); *Hendrickson v. Branstad*, 934 F.2d 158 (8th Cir.1991). The cases are inapposite. They do not speak to the ability of an attorney to bill clients directly and separately for overhead services or for time spent preparing a billing statement. Rather, the cases involve the awarding of attorney's fees for work performed by counsel during an administrative proceeding, *see Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, supra,* and the awarding of attorney's fees pursuant to fee shifting statutes, *see Rum Creek Coal Sales, Inc. v. Caperton, supra; Hensley v. Eckerhart, supra; White v. New Hampshire Dep't of Employment Services, supra; Hendrickson v. Branstad, supra.* We begin our analysis with a review of MRPC 1.5.

■ MRPC 1.5(a) requires that an attorney charge a client reasonable fees and sets forth various factors to be considered in determining reasonableness. The Rule deals not only with the determination of a reasonable hourly rate but also with the reasonableness of costs and the total charge billed to the client. While the Rule clearly allows attorneys to charge for work performed during the representation and to seek reimbursement for costs of services or expenses undertaken during the representation, we do not find it reasonable, under the circumstances presented, for Respondent to separately charge her clients for "accounting services." We view "accounting services" as an overhead expense incidental to the practice of law. As the American Bar Association's Standing Committee on Ethics and Professional Responsibility expressed in Formal Opinion 93–379, entitled "Billing for Professional Fees, Disbursements and Other Expenses":

When a client has engaged a lawyer to provide professional services for a fee (whether calculated on the basis of the number of hours expended, a flat fee, a contingent percentage of the amount recovered or otherwise) the client would be justifiably disturbed if the lawyer submitted a bill

to the client which included, beyond the professional fee, additional charges for general office overhead. In the absence of disclosure to the client in advance of the engagement to the contrary, the client should reasonably expect that the lawyer's cost in maintaining a library, securing malpractice insurance, renting of office space, purchasing utilities and the like would be subsumed within the charges the lawyer is making for professional services.

We agree with the sentiment of the ethics opinion and the hearing judge in this matter—absent advance disclosure to and consent of the client or special circumstances, the client should reasonably expect that the lawyer's costs and expenses in maintaining his or her practice of law would be subsumed within the charges the lawyer is billing for professional services. In other words, the ordinary and usual costs of operating a law office—rent, utilities, accounting and administrative services and the like—should not be individually billed to the client, in addition to a charge for legal representation, absent some other extenuating circumstances, which are not present in this case. It is the attorney's hourly rate or case fee that constitutes the professional fee that is charged for all of the services rendered.

In addition, we believe that a lawyer's billing practices implicate the principles of trust and confidence which are fundamental to the legal profession. "The lawyer's conduct should be such as to promote the client's trust of the lawyer and of the legal profession." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 379 (1993). Clients hire attorneys to represent them in legal matters and to solve their legal problems. Clients do not hire attorneys with the expectation that they will be charged for the attorney's time in preparing a bill for the services rendered. Administrative tasks, like accounting services, are best left to the general services the lawyer or his/her staff provides during the representation of the client.

Should a lawyer wish to charge clients for overhead costs and expenses, such a charge, including its method of

calculation, ought to be explained to the client prior to the start of representation, and expressly stated in the written retainer agreement. Most importantly, the client must consent in advance to the additional fees and their method of calculation.

In the instant matter, the record indicates that Respondent did not receive advance consent from her clients agreeing to pay additional expenses for "accounting services." In addition, the record indicates no extenuating circumstances justifying the separate charge. We hold that the practice of charging clients for "accounting services"—that is, billing clients for time spent completing time sheets and calculating bills therefrom—under these circumstances, was unreasonable and a violation of MRPC 1.5. Therefore, the exception is overruled.

## IX.

## THE HEARING JUDGE'S REFUSAL TO ALLOW THOMAS G. BODIE TO TESTIFY

Respondent contends that the hearing judge "improperly or improvidently refused to allow Thomas G. Bodie, the lawyer who represented Respondent during the investigatory phases of the six complaints," to testify about a meeting at Bar Counsel's office and also improperly refused to receive into evidence a subsequent proffer as to his testimony. Respondent intended to call Mr. Bodie to testify about a meeting between Respondent, Bar Counsel, and Mr. Bodie concerning allegations of misconduct alleged in six different complaints. Respondent wanted to elicit evidence concerning the unfair treatment of Respondent by Bar Counsel. Specifically, Respondent intended to establish that Bar Counsel chose only to prosecute one claim of misconduct in 2005 (the Sporay case) and reserved the remaining complaints for a later date, after Respondent had received a sanction from this Court in the Sporay case. We shall first set forth the series of events leading to the hearing judge's exclusion of Mr. Bodie's testimony.

On August 13 and 14, 2007, the hearing judge considered an objection by Bar Counsel to Respondent calling Mr. Bodie as a witness in her case. Bar Counsel asserted that Respondent had not listed Mr. Bodie's name or described his proposed testimony in her answers to relevant interrogatories. After hearing argument from counsel, the hearing judge sustained the objection and forbade Respondent from calling Mr. Bodie as a witness. The hearing judge explained his reasoning:

Number one, Mr. Bodie was not named in answers to interrogatories nor in supplemental answers to interrogatories nor prior to the start of these proceedings was there any communication directed to Ms. Kessler of any kind as to the purpose of calling Mr. Bodie or whatever information Mr. Bodie may possess with regard to the subject matter of these six things which form the basis of the petition filed by Bar Counsel. She is therefore in the dark as to what, if any, information Mr. Bodie may have with regard to these six clients' complaints....

Upon further inquiry by me it became clear to me that the purpose of calling Mr. Bodie however artfully or inartfully explained to me was to get into the record that there may have been at sometime in the past a discussion between Mr. Bodie representing [Respondent] and Mr. Hirschmann or an Assistant Bar Counsel concerning the possibility of resolving in one proceeding of some kind or another all outstanding complaints whatever they may have been in the office of Bar Counsel at the time. And indeed everyone agrees that such a meeting took place. However, both parties agree there was never any agreement and you, Mr. Lipsitz, have told me three times since I took the bench after the luncheon recess that there was never any such agreement....

The hearing judge also stated that he would not allow Mr. Bodie to testify due to the rule of evidence on testimony regarding settlement offers. The judge explained: "To the extent [ ] that any testimony of Mr. Bodie concerning settlement discussions between the Respondent and office of Bar Counsel would not be admissible in this case to prove liability

or nonliability for any reason because the rule is what it is and the case rises and falls on its own merits." Last, the hearing judge ruled that Mr. Bodie's testimony would not be relevant to the proceeding before him. Thereafter, counsel for Respondent requested that a proffer about Mr. Bodie's testimony be marked for identification and placed in the file. The hearing judge allowed the proffer to be placed on the record.

It is well settled in Maryland that the trial judge is entrusted with the role of administering the discovery rules and, as such, is vested with broad discretion in imposing sanctions when a party fails to comply with the rules. *See, e.g., Rodriguez v. Clarke,* 400 Md. 39, 56, 926 A.2d 736, 746 (2007); *N. River Ins. Co. v. Mayor of Baltimore,* 343 Md. 34, 47, 680 A.2d 480, 486–87 (1996); *Starfish Condo. Ass'n v. Yorkridge Serv. Corp.,* 295 Md. 693, 712, 458 A.2d 805, 815 (1983); *Klein v. Weiss,* 284 Md. 36, 56, 395 A.2d 126, 137 (1978); *Mason v. Wolfing,* 265 Md. 234, 236, 288 A.2d 880, 881 (1972). We will not disturb a trial court's decision to impose sanctions on a party unless there has been "a clear showing that this discretion was abused." *Mason,* 265 Md. at 235, 288 A.2d at 882. "Thus, we review the Circuit Court's determination of discovery sanctions under an abuse of discretion standard." *Clarke,* 400 Md. at 57, 926 A.2d at 747 (citing *N. River Ins. Co.,* 343 Md. at 47, 680 A.2d at 486–87; *Starfish Condo. Ass'n,* 295 Md. at 712, 458 A.2d at 815).

In the case *sub judice,* the discovery violation stems not only from Respondent's failure to list Mr. Bodie in her answers to Bar Counsel's interrogatories, but also from Respondent's and her counsel's failure to make a good-faith attempt at resolving the discovery dispute with Bar Counsel. The hearing judge gave Respondent ample time to provide Bar Counsel with a summary of what Mr. Bodie would testify to in the event he was called to testify; however, Respondent failed to do so. The hearing judge, therefore, determined that, in light of Respondent's failure to provide the required information to Bar Counsel, the appropriate sanction was to preclude the testimony of Mr. Bodie. "One form of sanction

authorized by the Maryland Rules is evidence preclusion, which we have affirmed where there has been a confluence of discovery failures related to such evidence." *Clarke*, 400 Md. at 66, 926 A.2d at 752; Maryland Rule 2–433(a)(2). Respondent's failure to furnish Bar Counsel with Mr. Bodie's name and expected testimony during the discovery process and her failure to make good faith efforts at correcting the omission, considering the exceptional leeway given by the hearing judge during the hearing, compels us to overrule this exception.

## X.

## EXCEPTION TO HEARING JUDGE'S CONCLUSION OF LAW THAT RESPONDENT VIOLATED MRPC 8.4.

Respondent next excepts to the hearing judge's conclusions in the section of his opinion entitled "Conduct Prejudicial to the Administration of Justice." Respondent argues that the hearing judge merely stated his personal opinion rather than entered a finding of fact or conclusion of law. In addition, Respondent contends that "in effect, [she] is being found to have violated Rule 8.4 because she has been found to have violated other MRPC." We overrule Respondent's exception. The hearing judge did not conclude Respondent violated Rule 8.4 because she was found to have violated other rules. The hearing judge explicitly said: "For the reasons stated in many complaints, I have found [Respondent] to have violated by clear and convincing evidence Rule 8.4(d) Conduct Prejudicial to the Administration of Justice." In reviewing the basis for the hearing judge's conclusions of law concerning the six individual complaints, it is clear that the hearing judge had independent reasons to find that Respondent violated Rule 8.4(d). For example, concerning the complaint of Mr. Dudock, the hearing judge found Respondent violated Rule 8.4(d) due to her "total lack of any follow through for well over one year, her failure to respond to Mr. Dudock's inquiries, and her failure to return the corporate books until over three months after she was asked." The hearing judge concluded that these

actions were prejudicial to the administration of justice. As to the complaint of Ms. Anderson, the hearing judge found that Respondent's "failure to diligently pursue Ms. Anderson's Separation Agreement and divorce [and her] unreasonably charging her for administrative overhead" as well as failing to maintain communications with Ms. Anderson amounted to "conduct prejudicial to the administration of justice in violation of Rule 8.4(d)." As to the complaint of Mr. Ferrara, the hearing judge found that Respondent's "conduct throughout the representation of Mr. Ferrara was conduct prejudicial to the administration of justice in violation of Rule 8.4(d)." As to Mrs. Caldarelli's complaint, the hearing judge found that Respondent's "neglect of Mrs. Caldarelli's case and lack of competence as well as her misrepresentations" amounted to "conduct prejudicial to the administration of justice, in violation of Rule 8.4(d)." As to Respondent's representation of Mr. Boone, the hearing judge found that Respondent's "failure to appear in court; her failure to communicate with Mr. Boone concerning the Order for three months; and, her failure to consult and discuss with Mr. Boone any settlement proposal before submitting it to opposing counsel" amounted to "conduct prejudicial to the administration of justice." Last, as to Mrs. Goodwin's complaint, the hearing judge found that Respondent violated Rule 8.4(d) because of "lack of diligence and competence, as well as her misrepresentations" to the client. Therefore, we overrule Respondent's exception.

## XI.

### EXCEPTION TO HEARING JUDGE'S DEMEANOR DURING THE HEARING

Last, Respondent excepts to the hearing judge's demeanor during the hearing. Specifically, Respondent complains of the hearing judge's frequent communications directed at her during the course of the hearing, on and off the witness stand. Respondent contends, citing *Ricker v. Ricker*, 114 Md.App. 583, 691 A.2d 283 (1997), that

[H]owever well intentioned the hearing judge's exchanges with Respondent may have been (and fully acknowledging the broad authority allocated to him as sole factfinder in a non-jury case), ... the judge's frequent interventions in the instant case may ... readily have had an undesirable chilling effect on Respondent's presentation of her evidence and could easily be taken as an indication that her testimony was being considered by the judge as being, from early in the hearing, at least suspect, thus again implicating an element of potential unfairness sufficient to create a violation of the widely recognized principle that a judicial proceeding must not only be fair, but also give the appearance of fairness, if due process concerns are to be avoided.

We overrule Respondent's exception.

As Respondent indicates in her exception, the intermediate appellate court in *Ricker v. Ricker, supra,* eloquently explained the role of a judge in a trial:

Judges, under the law, have wide latitude in the conduct of trials and may, when necessary, interrupt and restrict attorneys in the presentation of their cases in an attempt to assure a correct presentation. *Gerstein v. State,* 10 Md. App. 322, 270 A.2d 331 (1970), *cert. denied,* 402 U.S. 1009, 91 S.Ct. 2191, 29 L.Ed.2d 431 (1971). It is desirable that judges participate directly in trials: "[T]he trial judge bears the responsibility for the orderly and fair administration of a trial and is not to be merely regarded as a referee." *In re J.A. & L.A.,* 601 A.2d 69, 76 (D.C.App.1991). Particularly in non-jury cases, a trial judge is accorded substantial leeway in participating in the trial because the judge functions as a trier of fact as well. *Id.*

It is often helpful to a litigant in a non-jury case to discover the direction that the judge is leaning, or to assess the judge's evaluation of the evidence as it is unfolding. Judges frequently do what juries cannot do during trials and engage in colloquies with attorneys. Those colloquies can contribute to a sharpening of the attorneys' presentations and arguments. Participation by the court in the

questioning of witnesses or in commenting on the evidence can promote an orderly and efficient use of court resources.

Active involvement by a judge, however, must be done prudently. Even the most unbiased judge, by actively engaging in the trial, runs the risk of appearing to lack objectivity and may chill the attorney's capacity to represent the client's interest most effectively. A judge who makes comments that devalue a litigant's presentation midstream may not be forwarding the goals of a fair trial, but instead may lead the restricted party to believe that the judge is unwilling to listen. A judge who creates a courtroom atmosphere that appears unfair to the litigants may unintentionally cause the proceeding to become unfair. The litigants may react by abandoning a planned strategy or line of questioning that could affect the result or the record. A judge's participation should not overreach and disrupt a litigant's development of the evidence. Such behavior can transcend the bounds of proper judicial conduct and can go so far as to deprive a litigant of the right to a fair trial. *Western Maryland Dairy Corporation, et al. v. Brown,* 169 Md. 257, 266, 181 A. 468 (1935).

114 Md.App. at 594–95, 691 A.2d at 288–89. In the instant case, we are asked to determine whether Respondent was harmed in any way due to the hearing judge's conduct. In order for Respondent to prevail, she must "show some nexus between the alleged improper comment[s or conduct] and the course of the trial." *Ricker,* 114 Md.App. at 599, 691 A.2d at 291. Respondent, however, points to no specific comments in the record for us to review. Therefore, we overrule the exception.

### *SANCTION*

Having concluded that Respondent violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 1.16, 8.4(a), (c), and (d), we must determine the proper sanction. Respondent contends that no further sanction beyond that given in the previous attorney grievance case—*Attorney Grievance Comm'n v. Kreamer,* 387 Md. 503, 876 A.2d 79 (2005)-is necessary as "Respondent ... has al-

ready remained indefinitely suspended for more than several years beyond the earliest date when she could have reapplied." Respondent, nonetheless, recommends that the Court direct her to re-enroll in a remediation program. She explains: "A strong remedial program, with appropriate safeguarding conditions should suffice to cure whatever may have been ailing Respondent and to restore her to service as a practicing lawyer who will be a credit to the Bar and to herself." In the alternative, Respondent suggests that if the Court deems a period of suspension necessary, the suspension "should be for an interval not greater than the indefinite suspension awarded in the [prior attorney grievance case,] should include the same provision for reapplication and should be dated to begin on the same date that [her previous] indefinite suspension began."

Bar Counsel recommends disbarment. In support of this recommendation, Bar Counsel points to the hearing judge's finding that Respondent "committed violations of the Rules of Professional Conduct in connection with her representation of six (6) separate clients." Bar Counsel specifically points out Respondent's failure to competently and diligently represent her clients, her misrepresentations to both Mr. Ferrara and Mrs. Goodwin, and the improper billing of several clients for "accounting services." Bar Counsel then recounts Respondent's misconduct as to each of the six complaints. Finally, Bar Counsel notes:

The Respondent is unwilling to change the way she practices and instead of taking responsibility for her actions/inactions, places the blame on others. The Respondent's conduct in these six (6) separate matters is repetitive of prior misconduct for which this Court has issued sanctions. It appears that the Respondent's prior three sanctions by this Court and two year monitor has not caused the Respondent to improve her practice. Petitioner submits to this Court that the Respondent has evidenced, by her actions, a sufficient and persistent disregard for the Court's, her clients' best interest and the public. Therefore, a

disbarment in this matter is necessary to protect the public from future harm.

In the previous attorney grievance case involving Respondent, we set forth the important principles that this Court must adhere to when devising a sanction for an offending attorney:

[O]ur goal in attorney discipline matters is "to protect the public and the public's confidence in the legal profession rather than to punish the attorney." *Attorney Grievance Comm'n v. Christopher,* 383 Md. 624, 639, 861 A.2d 692, 701 (2004). Protecting the integrity of the legal profession and "deter[ing] other lawyers from engaging in violations of the Rules of Professional Conduct," are also reasons for sanctioning attorneys who violate the rules. *Attorney Grievance Comm'n v. Cassidy,* 362 Md. 689, 698, 766 A.2d 632, 637 (2001). "Determining the appropriate sanction requires the Court to consider the facts and circumstances of each particular case, including consideration of any mitigating factors." *Attorney Grievance Comm'n v. Post,* 379 Md. 60, 71, 839 A.2d 718, 724 (2003). In addition, " 'the nature and gravity of the violations and the intent with which they were committed' " are relevant considerations. *Id.* (quoting *Attorney Grievance Comm'n [ ] v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997)). We also have considered "the attorney's prior grievance history ... the attorney's remorse for the misconduct, and the likelihood of the conduct being repeated." *Post,* 379 Md. at 71, 839 A.2d at 724–725 (citations omitted). As stated in *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 794 A.2d 92 (2002), to determine an appropriate sanction we will, examine

the nature of the misconduct, the lawyer's state of mind which underlies the misconduct, actual or potential injury flowing from the misconduct, the duty of this Court to preserve the integrity of the profession, the risk to the public in allowing the respondent to continue in practice, and any mitigating or aggravating factors.

*Monfried,* 368 Md. at 396, 794 A.2d at 105.

*Attorney Grievance Comm'n v. Kreamer,* 387 Md. 503, 533–34, 876 A.2d 79, 97–98 (2005). Respondent has previously been the subject of disciplinary proceedings; indeed, this is Respondent's fourth interaction with the Attorney Grievance Commission. On February 2, 1999, this Court indefinitely suspended Respondent for failing to communicate with her clients and Bar Counsel, failing to deposit unearned fees into escrow, and misrepresenting the status of client matters. *Attorney Grievance Comm'n v. Kreamer,* 353 Md. 85, 724 A.2d 666 (1999). On November 19, 2002, Respondent was issued a public reprimand for not acting with diligence regarding a guardianship matter.[19] Thereafter, on June 21, 2005, this Court indefinitely suspended Respondent from the practice of law for violations of Rules 1.3, 1.4, 1.15, 1.16, 8.1, Maryland Rule 16–609, and § 10–306 of the Business and Occupations Article of the Maryland Code. *Kreamer,* 387 Md. at 538, 876 A.2d at 100. In large part, we found that Respondent had failed to communicate with her client, failed to represent the client in a diligent manner, and failed to maintain proper bookkeeping practices. As Respondent has asserted, she has not been reinstated to the practice of law since her 2005 indefinite suspension.

▉▉▉▉ "An attorney's prior disciplinary history is among the factors this Court considers in determining the appropriate sanction for misconduct." *Attorney Grievance Comm'n v. Mba–Jonas,* 402 Md. 334, 346, 936 A.2d 839, 846 (2007); *see also Attorney Grievance Comm'n v. Sapero,* 400 Md. 461, 490, 929 A.2d 483, 501 (2007); *Attorney Grievance Comm'n v. Hill,* 398 Md. 95, 103, 919 A.2d 1194, 1198 (2007). We note that, in the present matter, the disciplinary violations are substantially similar to those in Respondent's previous attorney grievance cases, especially the most recent 2005 case. We take into consideration that, to a certain extent, the time periods of the misconduct involved in the present matter and in the 2005 attorney grievance case overlap. In this case, a discussion between the hearing judge, Respondent's counsel and Bar

---

**19.** This Court reinstated Respondent on June 10, 1999, and required that she practice under the supervision of a monitor for two years.

Counsel at the Circuit Court hearing indicates that the six present complaints were not fully investigated by Bar Counsel at the time the petition for disciplinary action, stemming from her misconduct in the representation of Benchamas D. Sporay, was filed against Respondent. Ordinarily, given the overlap in the time period and the substantially similar violations involved, it would not be unreasonable to consider Respondent's violations in the six present complaints as a continuation of the misconduct that lead to her indefinite suspension in 2005. The instant complaints against Respondent, however, involve more serious violations, Rules 8.4(c) and (d), which reflect adversely upon Respondent's fitness to practice law.[20]

In addition, we consider "the nature and gravity of the violations and the intent with which they were committed" when devising a sanction for an offending attorney. *Attorney Grievance Comm'n v. Robertson,* 400 Md. 618, 642, 929 A.2d 576, 590 (2007); *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). In all six complaints, Respondent accepted fees and then failed to represent her clients competently or diligently. In addition, Respondent billed clients separately for accounting services that are customarily a part of the operating costs of a law practice, something that should not be billed individually to a client any more than the client should be billed individually for the cost of maintaining the lawyer's office building or the cost of maintaining the lawyer's secretary or office manager. In addition, there were no special circumstances presented in this case to warrant shifting these kinds of costs to the individual clients.

Most notably, however, Respondent engaged in conduct that was prejudicial to the administration of justice. Respondent's intentional disregard for her clients' legal matters led, for

---

**20.** In the instant matter, the hearing judge found that Respondent violated Rules 8.4(c) and (d) in her representation of Mr. Dudock, Mr. Ferrara, Mrs. Caldarelli, and Mrs. Goodwin. The hearing judge found a violation of Rule 8.4(d) with regard to Respondent's representation o f Mrs. Anderson an d Mr. Boone.

example, to Mrs. Caldarelli losing agreed-upon alimony support payments as well as her portion of her husband's pension and her portion of the martial home. In addition, Respondent misrepresented to four of her clients the status of their cases, all in an effort to hide her incompetence and lack of diligence. In the complaint of Mrs. Goodwin, for example, Respondent falsely represented to Mrs. Goodwin that she had filed a request for a order of default against Mr. Goodwin when she had not yet filed the motion. Such conduct is not becoming of a member of the Maryland Bar. We think Respondent's misconduct reflects her disregard for client matters and the rules of professional responsibility.

In *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 291, 793 A.2d 535, 544 (2002), we noted the serious nature of an attorney's intentional disregard of his clients' legal affairs:

In determining the proper course to follow when confronted with an attorney who has neglected the needs of his clients and failed to communicate with them, we have consistently regarded neglect and inattentiveness to a client's interests to be a violation of the Canons of Ethics warranting the imposition of some disciplinary sanction.... It is clear then that willful and flagrant neglect of a client's affairs is, in and of itself, the kind of misconduct by an attorney which can lead to disbarment.... [W]e have noticed too many instances when lawyers have agreed to represent clients and accepted fees, in part or in whole, only to completely neglect these same legal problems, causing the same clients emotional distress, financial loss, or other varying kinds of inconvenience.

(Quoting *Attorney Grievance Comm'n v. Manning*, 318 Md. 697, 703–05, 569 A.2d 1250, 1253–54 (1990)). Indeed, we have previously said that "[i]t is well settled, that [d]isbarment ordinarily should be the sanction for intentional dishonest conduct." *Harris*, 403 Md. at 167, 939 A.2d at 747 quoting *Attorney Grievance Comm'n v. Webster*, 402 Md. 448, 473, 937 A.2d 161, 175 (2007). "This is so because '[c]andor and truthfulness are two of the most important moral character traits of a lawyer.'" *Harris*, 403 Md. at 167, 939 A.2d at 747

(quoting *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 449, 635 A.2d 1315, 1319 (1994)); *see also Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 419, 773 A.2d 463, 488 (2001) (affirming the notion that, absent extenuating circumstances, intentional dishonest conduct implicates an attorney's basic character and warrants the sanction of disbarment).

Having considered the particular facts and circumstances of this case and Respondent's prior disciplinary record, we conclude that the appropriate sanction is disbarment. *See, e.g., Harris,* 403 Md. at 165–70, 939 A.2d at 746–48 ("Respondent's intentionally dishonest conduct, coupled with his extensive prior disciplinary record, compels us to state that the public only will be protected by the imposition of a sanction of disbarment."). Respondent has engaged in a pattern of conduct over her legal career which threatens the public's confidence and trust in the legal profession. Respondent's lack of competence, lack of diligence, lack of truthfulness and honesty in dealing with her clients, her failure to communicate with her clients, her misrepresentations to her clients, and her charging of unreasonable fees all lead to the most severe of sanctions—disbarment. "Only the most severe sanction of disbarment will provide the protection to the public that this procedure is supposed to provide." *Wallace,* 368 Md. at 293, 793 A.2d at 545.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THIS COURT, INCLUDING THE COST OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16-761 FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST BARBARA OSBORN KREAMER.**